**Larry MOFFETT, Petitioner–Appellee,**

v.

**Darrell KOLB, Superintendent, Waupun Correctional Institution, Respondent–Appellant.**

**No. 90–2921.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1991.

Decided April 16, 1991.

Donald T. Lang, Office of State Public Defender, Madison, Wis., for petitioner-appellee.

Donald J. Hanaway, Atty. Gen., Michael R. Klos, Asst. Atty. Gen., Office of Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for respondent-appellant.

Before CUMMINGS and FLAUM, Circuit Judges, and GRANT, Senior District Judge.*

PER CURIAM.

Petitioner Larry Moffett commenced this action by seeking a writ of habeas corpus

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is

from the district court on the ground that at his state court trial for attempted first-degree murder and attempted armed robbery, he was denied his right to effective assistance of counsel in violation of the Sixth Amendment. The district court granted habeas corpus relief but stayed its order for 60 days so that the State of Wisconsin could grant petitioner a new trial if it chose to do so.

After a jury trial, petitioner was found guilty of both offenses and was sentenced to concurrent prison terms of 18 years and 8 years. Although his brother Antonio was also charged with both offenses, the attempted first-degree murder charge against him was dismissed and we were informed at oral argument that the attempted armed robbery charge was later dismissed and that he was instead prosecuted for possession of a firearm. The record does not reveal the outcome of Antonio's trial. At Larry's trial, it was his theory that his brother Antonio used petitioner's revolver to shoot Jerome Tysen during the attempted armed robbery. Petitioner's attorney neglected to introduce evidence that corroborated the defense theory that it was Antonio Moffett rather than petitioner who fired the weapon that wounded Tysen. Judge Reynolds held that petitioner was prejudiced by his trial counsel's failure to introduce the prior inconsistent statements of state witness Frederick Brown, who twice told investigating detective Simons that Antonio Moffett rather than petitioner fired the gun at Tysen.

Judge Reynolds properly analyzed petitioner's claim that he was deprived of his right to effective assistance of counsel under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674. First, Judge Reynolds found that the representation of petitioner's counsel fell below an objective standard of reasonableness as required under prong one of *Strickland, id.* at 688, 104 S.Ct. at 2064,

sitting by designation.

affirming the finding by the state Supreme Court in this regard.

Turning next to prong two of *Strickland,* conditioning a Sixth Amendment violation on a finding that there is a reasonable probability that but for the counsel's unprofessional errors, the outcome would have been different, *id.* at 694, 104 S.Ct. at 2068, Judge Reynolds disagreed with the Wisconsin Supreme Court. He identified two principal reasons for finding that prong two had also been satisfied. First, there was the absence of any direct testimonial evidence that petitioner actually shot the victim. And second, Judge Reynolds found that although an expert testified that there were traces of greater than normal levels of barium and antimony on petitioner's hands, suggesting the use of a gun, the expert admitted that this evidence failed to prove that petitioner did or did not fire the gun.

In granting the writ of habeas corpus unless Wisconsin gave petitioner a new trial on the attempted first-degree murder charge,[1] District Judge Reynolds handed down the attached 15–page decision and order with which we fully agree. Therefore the district court's judgment is affirmed.[2]

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WISCONSIN

LARRY MOFFETT, *Petitioner,*

v.

DARRELL KOLB, Superintendent, Waupun Correctional Institution, *Respondent.*

Case No. 89–C–403

DECISION AND ORDER

### BACKGROUND

On April 10, 1989, petitioner Larry Moffett ("Moffett") filed with this court a petition for a writ of habeas corpus under Title 28 United States Code § 2254 and a request to proceed in forma pauperis. Moffett essentially requested this court to set aside the Wisconsin Supreme Court decision which overruled the Wisconsin Court of Appeals decision that Moffett was denied his constitutional right under the sixth amendment to effective assistance of counsel at trial. *See Wisconsin v. Moffett,* 147 Wis.2d 343, 433 N.W.2d 572 (1989). On April 24, 1989, this court granted Moffett's request to proceed in forma pauperis and ordered the respondent to file an answer to Moffett's petition. The parties completed the briefing of Moffett's petition on May 1, 1990, and, after reviewing the numerous transcripts, decisions, and briefs, this court grants Moffett's petition. This court, however, stays the granting of Moffett's petition for sixty (60) days in order to permit the State of Wisconsin to grant Moffett a new trial if it chooses.

### FACTS

Moffett was convicted of attempted armed robbery and attempted first degree murder for his actions involving Jerome J. Tysen ("Tysen") outside of Gerald's Tavern in Milwaukee on April 24, 1985. Tysen left Gerald's Tavern at approximately 10:00 p.m. with Amy Sprawls ("Sprawls") and Linda Hasslinger ("Hasslinger"), and went to Tysen's car (Nov. 12, 1985 Tysen Transc. 92–93). Upon exiting the bar, Tysen noticed three men, two of whom followed him to his car. (*Id.* at 93). Tysen was unable to identify any of the three men at trial. (*Id.*) After Tysen unlocked the passenger doors for Sprawls and Hasslinger and went to the driver's side of the car, one of the men approached Tysen, pointed a gun at his waist, and told him to give him everything he had. (*Id.* at 94–95). Tysen did not give the man any money, but instead got into his car and locked the doors after being hit by the man with the gun. (*Id.*) After starting the engine, the driver's window shattered and Tysen felt a pain in his

---

1. Petitioner's conviction for attempted robbery was not affected by the district court's judgment.

2. Our affirmance renews the district court's 60–day stay giving Wisconsin the option of granting Moffett a new trial on the attempted first-degree murder charge.

neck. (*Id.* at 97). Tysen drove two or three blocks and flagged down a police car, and it was later determined that Tysen had been hit in the neck by a .25 caliber bullet.

Sprawls testified that she was seated in the right rear seat of Tysen's car and that she saw someone arguing with Tysen at the driver's door after she entered the car (Nov. 13, 1985 Sprawls Transc. 19–20). She testified that the person arguing with Tysen had a gun pointed at Tysen's stomach, but that from her vantage point she was unable to see any faces and could not identify the person holding the gun or state whether or not more than one person was involved in the argument. (*Id.* at 23–25, 34, 36–39).

Hasslinger testified that she was sitting in the right front passenger seat and that she saw a man who she identified as Moffett walk up to Tysen and point a gun at his stomach (Nov. 13, 1985 Hasslinger Transc. at 78). Upon seeing the gun, she slid down under the dashboard which prevented her from seeing out the back window. (*Id.* at 80). She testified that she could still see through the driver's side window and that she saw Moffett hit Tysen twice on the head with the gun, and that he was holding the gun immediately before Tysen entered the car. (*Id.* at 79–82). Hasslinger did not see a second man, did not see Moffett shoot the gun, and did not see Moffett holding the gun after the window shattered. (*Id.* at 82, 101–02).

Frederick (Ricky) Brown ("Brown") testified that he had gone to Gerald's Tavern on April 24, 1985 with Moffett, Moffett's brother Antonio Moffett ("Antonio"), and Brian Lewis ("Lewis") (Nov. 14, 1985 Transc. at 4–6). Brown followed Moffett and Antonio outside of Gerald's and observed them standing side-by-side near the driver's side of Tysen's car. (*Id.* at 8, 11). Brown testified that he saw Moffett strike Tysen in the stomach and on top of the head with a dark object that could have been a gun or a nightstick. (*Id.* at 11, 37, 45). Once Tysen got into his car, Brown turned around and began to go back into Gerald's Tavern. (*Id.* at 14, 36, 45). After hearing a window shatter, Brown turned

back around and saw Moffett and Antonio standing near each other by the car. (*Id.* at 14, 45). Brown did not see anyone fire a gun, and did not see a gun in Moffett's hand when he turned back around. (*Id.* at 38). During trial, Brown denied ever seeing Antonio holding a gun when he turned back around and also denied ever telling the police that after the window shattered he "saw Andy lift the gun." (*Id.* at 14, 40).

Brown then went back into Gerald's Tavern and told Lewis it was time to leave. (*Id.* at 15). Brown, Lewis, Moffett, and Antonio then got into Lewis's car and drove off. (*Id.* at 15). Brown testified that an argument between Moffett and Antonio occurred in Lewis's car where Moffett asked Antonio why he had done it. (*Id.* at 16, 42). The argument became so heated that Lewis told everyone to get out of his car. (*Id.* at 17).

The police received a report of the shooting at 10:10 p.m., and Moffett and Antonio were arrested some time before 11:00 p.m. (Nov. 14, 1985 Suvaka Transc. at 47). Officer Leonard Karpinski took swabs of Moffett's and Antonio's hands for the purpose of conducting tests to detect the presence of barium and antimony (Nov. 14, 1985 Karpinski Transc. at 52–55). Tests on the swabs were conducted by Michael Camp ("Camp") of the Wisconsin Crime Laboratory in Milwaukee. Camp found levels of barium and antimony on the swab taken from Moffett's right palm to be consistent with the firing of a gun, but the swabs taken from Antonio did not reveal levels consistent with the firing of a gun (Nov. 15, 1985 Camp Transc. at 15–16).

Moffett claims that he was denied his sixth amendment right to effective assistance of counsel because his attorney failed to introduce into evidence a police report containing statements Brown had made to the police regarding Brown's knowledge of the shooting. The police report indicated that Brown had told police detectives (1) that "when [he] heard the window break, [he] saw Andy [Antonio] lift the gun" and (2) that while riding in the car with Antonio and Moffett after the incident he heard Antonio say to Moffett "if it didn't work,

then how come the gun went off when I fired it?" (Jul. 2, 1987 Court of Appeals Decision at 13). These statements were relevant to defense counsel's theory that Antonio had grabbed the gun from Moffett's hand and shot Tysen, and were important because Brown's testimony at trial was inconsistent with these statements.

Moffett's claim that he was denied his sixth amendment right to effective assistance of counsel has had varying degrees of success in the Wisconsin state court system. The trial court conducted a post-conviction hearing on Moffett's motion for a new trial on this ground and held that although trial counsel's conduct fell "below an objective standard of reasonableness," Moffett "was not prejudiced." (Sep. 9, 1986 Mem. & Dec. at 5). Neither Moffett nor the state contested the trial court's finding that counsel's representation fell below an objective standard of reasonableness, but Moffett appealed the court's decision that this deficiency was not prejudicial. The Wisconsin Court of Appeals reversed the trial court's decision and remanded the case for a new trial because it concluded that counsel's ineffective assistance jeopardized the reliability of the proceedings and undermined confidence in the results. (Jul. 2, 1987 Court of Appeals Decision at 19–20). The Wisconsin Supreme Court then reversed the Court of Appeals decision because it concluded "that defense counsel's errors could have had only an isolated, trivial effect" on the outcome of the case. (*Moffett*, 147 Wis.2d at 357, 433 N.W.2d 572).

## ANALYSIS

The United States Supreme Court has held that a criminal defendant's sixth amendment right to effective assistance of counsel is denied if (1) the counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that but for the counsel's unprofessional errors the outcome of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984).

In the present case, the trial court found that defense counsel's errors resulted in counsel's representation falling below an objective standard of reasonableness. Neither Moffett nor the state challenged these findings in either the Wisconsin appellate or supreme court, and as a result these courts considered the first prong of the *Strickland* test to be satisfied. In *Strickland,* the Supreme Court explained what weight a federal district court should give to a state court's findings regarding ineffective assistance of counsel in a habeas proceeding:

Finally, in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d). Ineffectiveness is not a question of "basic, primary, or historical fac[t]." Rather, like the question whether multiple representation in a particular case gave rise to a conflict of interest, it is a mixed question of law and fact. Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), and although district court findings are subject to clearly erroneous standard of Federal Rule of Civil Procedure 52(a), both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.

466 U.S. at 698, 104 S.Ct. at 2070 (citations omitted). Accordingly, this court has not accepted the trial court's finding, but instead has considered for itself whether or not Moffett's counsel's errors resulted in his assistance falling below an objective standard of reasonableness.

The record indicates that Moffett's counsel's primary theory of defense was that Antonio had grabbed the gun from Moffett and shot Tysen. This theory was plausible and had a reasonable chance of success because there were no witnesses who saw Moffett shoot the gun or have the gun in his possession after the shooting. In fact, the only direct evidence of the location of

the gun during the shooting were the two statements that Brown had made to the police officer regarding his seeing Antonio with the gun immediately after the shooting and then hearing Antonio say that he shot the gun. These statements were critical evidence for Moffett's counsel's defense theory, and his failure to produce them at the trial most definitely fell below an objective standard of reasonableness. Thus, this court concludes that the first prong of the *Strickland* test is satisfied.[1]

The question of whether or not Moffett's counsel's errors prejudiced the outcome of the trial is a much more difficult one to answer. The Supreme Court has elaborated on the prejudice portion of the *Strickland* test by stating:

> Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

466 U.S. at 694, 104 S.Ct. at 2068 (citations omitted). In addition, the Court has held that in determining if a reasonable probability exists a court should consider "the totality of the evidence before the judge or jury." (*Id.* at 695, 104 S.Ct. at 2069). In the present case, the totality of the evidence indicates that there is a reasonable probability that but for Moffett's counsel's errors, the jury verdict would have been different because Brown's omitted statements undermine this court's confidence in the jury's verdict.

The first error which Moffett's counsel made was his failure to impeach Brown's testimony that he had never told an officer that he had seen Antonio holding the gun after he turned around when the window shattered. During cross-examination the following exchange between Moffett's counsel and Brown, who was appearing as a witness for the state, occurred:

Q: Okay. Do you remember telling him [police detective] that when you "Heard the window break, you saw Andy [Antonio] lift the gun." Do you remember telling him that?

A: No.

Q: Do you deny telling him that?

A: Yes.

Q: Did you tell that to Detective Simons that "I saw the gun—Andy lift the gun after the window shattered"?

A: I told no one that.

Q: You never said that?

A: No.

(Nov. 14, 1985 Brown Transc. at 40). This testimony directly contradicted Brown's statement to the police detective that "when [he] heard the window break, [he] saw Andy [Antonio] lift the gun" (Jul. 2, 1987 Court of Appeals Decision at 13). Although Brown's testimony made the jury aware that a discrepancy regarding whether or not he saw Antonio holding the gun may exist, Moffett's counsel's failure to produce the police report rendered Brown's statement that he had never seen Antonio with the gun completely trustworthy. If Brown had been impeached with his earlier statement, then the jury would have been forced to assess his credibility and very well could have not believed his latter testimony.

The second error committed by Moffett's counsel concerned his failure to ask Brown about the statement he made to the police regarding Antonio's statement about Antonio's firing of the gun. During the trial,

---

**1.** This court, however, notes that the Supreme Court in *Strickland* held that the two parts of the test it created do not have to be considered in any particular order:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.

466 U.S. at 697, 104 S.Ct. at 2069.

Brown testified that after the shooting while riding in a car with Moffett and Antonio, he heard the two of them arguing, and that Moffett asked Antonio why he shot Tysen:

Q: Could you make out what was being said between Larry and Antonio?

A: Well, they was cussing and arguing at each other about what happened, why did he do it, and he was saying, "Why did you do it?" Couldn't hardly make out too much.

Q: Did you understand what was going on?

A: They was arguing about what they had just happened.

Q: Do you recall specifically what Larry Moffett said?

A: Nothing but why did Andy do it.

(Nov. 14, 1985 Brown Trans. at 16). In addition, on cross-examination, Brown reiterated his testimony that he had heard Moffett ask Antonio why Antonio had "done it":

Q: And you also testified that on the way Larry said to Antonio, "Why did you shoot him?"

A: Why did he do it.

Q: Okay. "Why did you do it?"

A: Yah.

(*Id.* at 42). These passages are important because they indicate that the jury was aware that Brown had heard statements made by Moffett which suggested that Antonio had been the individual who shot Tysen. The jury, however, did not hear Brown's statement to the police that Antonio himself had made a statement acknowledging that he had been the person who had shot Tysen. Although Brown's alleged statement to the police is consistent with and cumulative to what he testified to at trial regarding the argument, it is valuable additional evidence because its self-incriminating nature renders it more reliable than Moffett's statement that Antonio did it.[2]

If the jury had been provided with Brown's statements to the police that (1) he saw Antonio holding the gun after the window shattered and (2) he heard Antonio himself state that he was the one who fired the gun, then there is a reasonable probability that Moffett's defense theory would have been successful. This court, however, recognizes the fact that no one understands how a jury reaches a verdict and that their decisions are often unpredictable. This court cannot accurately predict whether or not Brown's statements would have altered the jury's verdict. There are, however, two facts which force this court to question whether or not the jury's decision would have been different had they been made aware of Brown's statements to the police.

First, there was no direct testimonial evidence that Moffett was the individual who shot Tysen. Tysen testified that he could not identify the man who hit him prior to his entering his car nor the man who shot him once he was inside his car (Nov. 12, 1985 Tysen Transc. at 100, 117; Nov. 13, 1985 Tysen Transc. at 14). Similarly, Sprawls testified that she could not identify the man who hit Tysen prior to entering the car nor the man who shot Tysen after he was in the car (Nov. 13, 1985 Sprawls Transc. at 20–21, 31, 36–37). Hasslinger testified that she saw Moffett approach Tysen and hit him with a gun (Nov. 13, 1985 Hasslinger Transc. at 78) prior to his entering the car, but she did not see Moffett fire the gun nor did she see him holding the gun after the window shattered (Nov. 13, 1985 Hasslinger Transc. at 101–02, 104, 106). And, neither Moffett nor Antonio testified. Thus, of the witnesses who were present at the scene of the crime, only one, other than Brown, saw Moffett hit Tysen before Tysen entered his car, and no witness saw Moffett shoot Tysen or have the gun after the shooting. In fact, the only witness who claims to have had a view of Moffett and Antonio immediately after the shooting was Brown.

---

**2.** Although Brown's statement to the police regarding Antonio's statement is double-hearsay it would have been admissible as evidence. First, Brown's statement to the police would have been admissible pursuant to Fed.R.Evid. 803(8). Second, Antonio's statement to Moffett which

Brown overheard would have been admissible (1) pursuant to Fed.R.Evid. 804(b)(3) if Antonio refused to testify or (2) pursuant to Fed.R.Evid. 613 if Antonio testified and denied having shot Tysen.

Second, the strongest evidence that Moffett, rather than Antonio, shot Tysen consisted of expert witness Camp's testimony that swabs taken from Moffett's right hand contained traces of barium and antimony above threshold levels, while swabs from Antonio's hands did not (Nov. 14, 1985 Camp Trans.). Camp testified, however, that the existence or nonexistence of barium and antimony above threshold levels is not conclusive proof that an individual did or did not fire a gun:

Q: So that what this says, in other words, is just because the barium-antimony residue test showed less that threshold levels, it doesn't meant this man didn't fire a gun.

A: That's correct.

. . . .

Q: This does not prove that the subject discharged a firearm since the gunshot residue test is a presumptive type of analysis and there are other ways by which barium and antimony can be deposited on the hands, correct?

A: That's correct.

Q: So what that really is saying is the converse or the obverse of Paragraph 3. It's saying, "Listen, just a minute. Because I found barium and antimony above threshold levels doesn't prove that he fired the gun either."

A: It doesn't uniquely prove that he fired a gun, period, right.

(Nov. 14, 1985 Camp Trans. at 34–36). Camp's testimony no doubt was significant in convincing the jury to reach a guilty verdict. Camp's testimony, however, was not conclusive evidence that Moffett shot Tysen, and if the jury had been aware of Brown's omitted statements, then it might have taken a more critical look at the limitations of the barium-antimony evidence. Although this court suspects that this chemical evidence may still carry the day in a new trial, the evidence is not conclusive and becomes weaker when Brown's omitted statements are considered.

These two facts concerning the depth and nature of the total evidence against Moffett force this court to question whether or not the addition of Brown's statements would cause the jury to reach a different verdict. Specifically, this court questions, based on the totality of the evidence in this case, whether or not a jury could find, when Brown's statements are considered, that there was proof beyond a reasonable doubt that Moffett was the individual who shot Tysen. This questioning, in turn, undermines this court's confidence in the jury verdict and leads this court to the conclusion that Moffett was prejudiced by his counsel's ineffective assistance.

IT IS THEREFORE ORDERED that Larry Moffett's petition for a writ of habeas corpus is GRANTED.

IT IS FURTHER ORDERED that the granting of the writ of habeas corpus is stayed for sixty (60) days so that the State of Wisconsin can grant Larry Moffett a new trial if it so chooses.

IT IS FURTHER ORDERED that nothing in this order affects Larry Moffett's conviction for attempted robbery.

Dated at Milwaukee, Wisconsin, this 30th day of July, 1990.

BY THE COURT:
/s/John W. Reynolds
John W. Reynolds
Senior Judge