Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/19/2019 09:07 AM CDT

Harley Smith, appellant, v. Meyring
Cattle Company, L.L.C., appellee.

___ N.W.2d ___

Filed January 25, 2019.    No. S-18-184.

1. **Directed Verdict: Appeal and Error.** In reviewing a trial court's ruling
   on a motion for directed verdict, an appellate court must treat the motion
   as an admission of the truth of all competent evidence submitted on
   behalf of the party against whom the motion is directed; such being the
   case, the party against whom the motion is directed is entitled to have
   every controverted fact resolved in its favor and to have the benefit of
   every inference which can reasonably be deduced from the evidence.
2. **Statutes: Appeal and Error.** Statutory interpretation presents a ques-
   tion of law, for which an appellate court has an obligation to reach
   an independent conclusion irrespective of the decision made by the
   court below.
3. **Animals: Liability: Legislature: Words and Phrases.** The meaning of
   each term in the list of acts by a dog which subject its owner to liability
   under Neb. Rev. Stat. § 54-601(1)(b) (Reissue 2010)—currently, "kill-
   ing, wounding, injuring, worrying, or chasing"—is dependent on the
   other in the context that the Legislature chose to place them.
4. **Animals: Liability.** The common-law basis for strict liability for the
   acts of one's dog depends upon establishing that the dog has dangerous
   propensities or tendencies, because at common law, dogs are presumed
   harmless.
5. **Statutes.** Statutes effecting a change in the common law should be
   strictly construed.
6. **Animals: Liability: Words and Phrases.** "Injuring" under Neb. Rev.
   Stat. § 54-601(1)(b) (Reissue 2010) is limited to bodily hurt caused by
   acts directed toward the person or animal hurt.

Appeal from the District Court for Box Butte County: Travis
P. O'Gorman, Judge. Affirmed.

James R. Welsh and Christopher Welsh, of Welsh & Welsh, P.C., L.L.O., for appellant.

Steven W. Olsen and Jonathan C. Hunzeker, of Simmons Olsen Law Firm, P.C., L.L.O., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## NATURE OF CASE

A ranch employee was injured, allegedly as a result of the ranch's herding dog nipping at a cow, causing the cow to charge into the employee. The question presented is whether, as a matter of law, such allegations fall outside the strict liability statute, which states in relevant part that the owner or owners of any dog or dogs shall be liable for any and all damages that may accrue to any person, firm, or corporation by reason of such dog or dogs killing, wounding, injuring, worrying, or chasing any person or persons.

## BACKGROUND

Harley Smith worked for the Meyring Cattle Company, L.L.C. (Meyring), and was injured in an accident that occurred in December 2011. He sued Meyring under negligence theories and also under strict liability as set forth in Neb. Rev. Stat. § 54-601(1) (Reissue 2010), alleging damages accruing from a Meyring herding dog "injuring" him. During a jury trial, the following evidence was adduced.

On the day of the accident, Smith had been pouring a lice control product on cows' backs, while Jay Meyring, a co-owner of Meyring, vaccinated them and another employee tagged them. This process involved herding cattle into holding pens, moving a few cows at a time into a "tub," and then guiding them from the tub into an alley that led into a chute.

Jerry Meyring, Jay's father and co-owner of Meyring, herded the cattle into the holding pens. He then spent most

of the day moving them in small groups into the tub and then into the alley. From a platform outside the alley, Smith poured the lice control product onto the cattle as they moved in the alley toward the chute, where the tagging and vaccinations occurred.

Occasionally, when Jerry had to move more cattle into the holding pens from "the hill" where the herd congregated, Smith was placed in charge of moving the small group of cows from the tub into the alley. Smith was performing that task at the time of the accident, which occurred near the end of the workday.

According to Smith, there were two cows left in the tub. Smith moved toward the alley to see how many cows were inside. At that time, one cow moved past Smith from the tub into the alley. The other cow was still near the gate opposite the alley. Smith testified that he then saw the herding dog named "Gunner" on the outside of the gate leading into the tub, "nipping" or "snapping" at the remaining cow's hooves through a 6-inch opening at the bottom of the gate. Smith stated the cow immediately charged forward.

Smith was trampled by the cow and sustained extensive injuries. Smith was found lying in the middle of the alley with three cows in front of him and one behind. Smith did not clearly describe how he got there but stated that it was the result of being knocked down by the cow that Gunner had nipped. Smith opined that the only reason the cow had "charged" at him was that Gunner was "nipping on the bottom of its foot."

Jerry confirmed that the herding dogs at the ranch were bred and trained to nip at the heels of cattle, which is designed to make the cattle move away from the dog, or "escape" in a "flight response." Meyring's herding dogs were not allowed to be near cattle in enclosed areas. That, Jerry conceded, would create a danger, especially if a person was in the enclosed space with the cattle.

Gunner was trained to stay away from the enclosed tub/alley/chute area and instead lie down by the "chute house" some distance away. Jay testified that he had never had any trouble with Gunner staying where he was supposed to be. Jay, Jerry, and another employee who testified had never seen Gunner around the tub area, and they did not see him there on the day of the accident.

Both Jay and Jerry testified that Smith should have never entered the alley and that there were several other avenues of escape from an agitated cow in the tub. Evidence was presented that the cow in question did not appear agitated immediately after the accident, and Jerry suggested that the tub was not large enough for any cow to build up significant speed. Jay testified that Smith should not have been near the alley, looking in, because that was not part of the process.

Smith's girlfriend at the time of the accident testified that she and Smith had stayed up the night before the accident "getting high on methamphetamine" and that Smith "smoked another bowl of meth" on his lunch break. There was medical evidence that Smith was under the influence of methamphetamine at the time of the accident.

The district court granted Meyring's motion for a directed verdict on the strict liability claim under § 54-601. Smith's negligence claims were submitted to the jury, which rendered a verdict in favor of Meyring. Smith appeals the directed verdict on the strict liability claim under § 54-601(1).

## ASSIGNMENTS OF ERROR

Smith assigns that the district court erred in finding as a matter of law that § 54-601 did not apply to the facts of this case and in granting Meyring's motion for partial directed verdict on the issue of strict liability.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an

admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.[1]

[2] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[2]

## ANALYSIS

The question in this case is whether strict liability under § 54-601(1) encompasses the act of a herding dog nipping at the heels of a cow, causing the cow to move forward, collide with a ranch employee, and inflict "bodily hurt" on the employee. Section 54-601(1) provides:

> Dogs are hereby declared to be personal property for all intents and purposes, and, except as provided in subsection (2) of this section, the owner or owners of any dog or dogs shall be liable for any and all damages that may accrue (a) to any person, other than a trespasser, by reason of having been bitten by any such dog or dogs and (b) to any person, firm, or corporation by reason of such dog or dogs killing, wounding, injuring, worrying, or chasing any person or persons or any sheep or other domestic animals belonging to such person, firm, or corporation. Such damage may be recovered in any court having jurisdiction of the amount claimed.

Smith argues that he presented evidence from which a jury could have concluded that Meyring was liable by reason of Gunner "injuring . . . any person" as stated in § 54-601(1)(b).

---

[1] *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018).

[2] *Wisner v. Vandelay Investments*, 300 Neb. 825, 916 N.W.2d 698 (2018).

He points out that to "injure" has a broad definition of "'to inflict bodily hurt on [someone or something],'"[3] that standard principles of proximate causation apply in strict liability actions,[4] and that an animal's normal response to an action is not a superseding cause in the chain of proximate causation.[5] Regardless of the merits of these propositions in the abstract, we agree with the district court that Smith misinterprets § 54-601.

[3] We have long strictly construed § 54-601, and the Legislature has repeatedly acquiesced to our understanding of its intent.[6] In particular, we have held that the meaning of each term in the list of acts by a dog which subject its owner to liability under § 54-601(1)(b)—currently, "killing, wounding, injuring, worrying, or chasing"—"is dependent on the other in the context that the Legislature chose to place them."[7] We have consistently explained that the relevant context was the Legislature's intent in enacting § 54-601 to derogate from the corresponding strict liability common-law action only by eliminating the need to prove that the owner had knowledge of the dog's dangerous propensities—and only as to the acts and persons described in the statute.[8] Under the common-law strict liability action that was modified by § 54-601 for those to which § 54-601 applies, a plaintiff had to demonstrate both (1) that the dog was vicious or had

---

[3] *Grammer v. Lucking*, 292 Neb. 475, 478, 873 N.W.2d 387, 389 (2016), quoting Merriam-Webster's Collegiate Dictionary 601 (10th ed. 2001).

[4] See, *Staley v. City of Omaha*, 271 Neb. 543, 713 N.W.2d 457 (2006); *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987); 5 American Law of Torts § 18:36 (2016); 65 C.J.S. *Negligence* § 250 (2010).

[5] See *Brown v. Kaar*, 178 Neb. 524, 134 N.W.2d 60 (1965).

[6] See *Underhill v. Hobelman*, 279 Neb. 30, 776 N.W.2d 786 (2009).

[7] *Donner v. Plymate*, 193 Neb. 647, 650, 228 N.W.2d 612, 614 (1975).

[8] See, *Guzman v. Barth*, 250 Neb. 763, 552 N.W.2d 299 (1996); *Paulsen v. Courtney*, 202 Neb. 791, 277 N.W.2d 233 (1979); *Donner v. Plymate, supra* note 7.

dangerous propensities and (2) that the owner knew the dog to be vicious or dangerous.[9]

[4,5] The common-law basis for strict liability for the acts of one's dog depends upon establishing that the dog has dangerous propensities or tendencies,[10] because at common law, dogs are presumed harmless.[11] The common law recognizes the right of the owner to keep a vicious dog for the necessary protection of life and property, but that one exercising the right to keep an inherently dangerous dog must do so at his or her own risk and be held strictly liable for any damage resulting to another.[12] The vicious or dangerous nature of the dog is essential to such a claim.[13] Statutes effecting a change in the common law should be strictly construed.[14]

Thus, we have held that the terms in the list of actions described in § 54-601(1)(b) must be "read together"[15] in light of the context of the statute to provide for strict liability without proof of the owner's knowledge of the dog's "'dangerous propensities.'"[16] It is improper to read the words as "detached and separated."[17] Instead, "the meaning of each is dependent on the other."[18] And we have noted that many of the words

---

[9] See *Netusil v. Novak*, 120 Neb. 751, 235 N.W. 335 (1931). See, also, *Paulsen v. Courtney, supra* note 8; *Lee v. Weaver*, 195 Neb. 194, 237 N.W.2d 149 (1976); *Fritz v. Marten*, 193 Neb. 83, 225 N.W.2d 418 (1975); 7 American Law of Torts § 21:50 (2018).

[10] See, e.g., 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 23 (2010); 4 J.D. Lee & Barry A. Lindahl, Modern Tort Law: Liability and Litigation § 37:4 (2d ed. 2006).

[11] See 7 American Law of Torts § 21:52 (2018).

[12] See *Netusil v. Novak, supra* note 9.

[13] See, generally, *id.*

[14] See *Paulsen v. Courtney, supra* note 8.

[15] *Donner v. Plymate, supra* note 7, 193 Neb. at 650, 228 N.W.2d at 614.

[16] *Paulsen v. Courtney, supra* note 8, 202 Neb. at 795, 277 N.W.2d at 235.

[17] *Donner v. Plymate, supra* note 7, 193 Neb. at 650, 228 N.W.2d at 614.

[18] *Id.*

of this statutory list inherently entail violence or an intent to harm. Thus, a "'wound'" is "'[a]n injury of a person or animal in which the skin or other membrane is broken, as *by violence* or surgery.'"[19] To "'worry'" is "'to treat *roughly* as with continual biting' or 'to bite or tear with the teeth.'"[20] To "'chase'" under the statute has been defined variously as "'to follow quickly or persistently *in order to catch or harm*,'" "'to make run away; drive,'" or "'to go in pursuit.'"[21] In other words, the element that the dog be vicious or have dangerous propensities is implicitly part of the statute through these terms, read jointly.[22]

Because the acts described in § 54-601(1)(b) were intended to be understood as violent acts stemming from dangerous propensities, we have held that playful and mischievous acts of dogs directed toward the person sustaining bodily hurt were not encompassed by § 54-601.[23] In *Donner v. Plymate*,[24] for example, we affirmed summary judgment in favor of the dog owner on a § 54-601 claim when the plaintiff sustained an injury after a dog collided with her knee in the course of chasing her playfully as part of the dog's exercise. Similarly, in *Holden v. Schwer*,[25] we held that acts of a puppy playfully running after a three-wheeler and abruptly stopping in front of it, causing the driver to sustain injuries when she veered to avoid the puppy, were not encompassed by § 54-601. We have explained that "[o]bviously the Legislature was fully aware of the need for protection from the intentional, deliberate,

---

[19] *Id.* (emphasis supplied).

[20] *Id*. (emphasis supplied).

[21] *Id.* (emphasis supplied).

[22] See, *Holden v. Schwer*, 242 Neb. 389, 495 N.W.2d 269 (1993); *Paulsen v. Courtney, supra* note 8; *Donner v. Plymate, supra* note 7.

[23] See *id*. See, also, *Underhill v. Hobelman, supra* note 6.

[24] *Donner v. Plymate, supra* note 7.

[25] *Holden v. Schwer, supra* note 22.

and purposeful acts of dogs and as a result restricted section 54-601 . . . to those acts manifesting such qualities."[26]

We have also explained in relation to the meaning of the language of § 54-601(1)(b) that "[t]he purpose of the original statute was to protect domestic animals, which are ordinary prey of dogs."[27] In fact, it was not until 1961 that the language of this "nonbiting" subsection of the statute was amended to apply to a "person or persons" "kill[ed], wound[ed], worr[ied], or chas[ed]" by the dog.[28] Before that time, the provision here at issue encompassed only actions directed toward domestic animals owned by the plaintiff and allowed recovery only for damages caused by harm to such domestic animals.[29] Before 1961, bodily hurt sustained directly by a person fell under § 54-601 only if such person had been bitten as described in subsection (1)(a) of the statute.

When the Legislature added "any person or persons" as an object of the dog's acts described by § 54-601(1)(b), the Legislature clearly meant to expand compensability under the statute to harm to a person caused by acts other than biting, acts which manifested the dangerous propensities that are the historical foundation for the common-law strict liability claim. Thus, after the amendment, people could bring strict liability claims under § 54-601(1)(b) for injuries they sustained during falls precipitated by dogs "worrying, or chasing" them; whereas before, they could not.

That language, however, has never been understood as encompassing bodily hurt to a person by way of a dog worrying or chasing "any sheep or other domestic animals" that, in turn, collided with the person. Such behavior toward the dog's "ordinary prey" has historically been compensable under

---

[26] *Donner v. Plymate, supra* note 7, 193 Neb. at 649-50, 228 N.W.2d at 614.

[27] *Id*. at 649, 228 N.W.2d at 614.

[28] See 1961 Neb. Laws, ch. 268, § 1, p. 786. See, also, *Donner v. Plymate, supra* note 7.

[29] *Id.*

§ 54-601 only if the owner of the "prey" sustained indirect damages by virtue of the harm to the animal. And, as stated, all the words of § 54-601(1)(b) must be read together in the context that the Legislature chose to place them.

To understand the statute more broadly, as Smith suggests, would vastly expand the scope of strict liability for dog owners. In fact, Smith's proposed interpretation of the statute would effectively abrogate the common-law negligence action that has traditionally coexisted with § 54-601 and with the common-law strict liability action. A broad reading of the statute limited only by proximate causation and without any additional requirement that the dog's behavior somehow manifest dangerous propensities would eliminate any reason for nontrespassing persons suffering bodily hurt to proceed in negligence, where they would have the additional burden to prove that the owner of the nonvicious dog should have reasonably anticipated the occurrence.[30]

To accept Smith's suggested interpretation of the statute would make dog owners strictly liable for actions directed toward "ordinary prey" whenever the prey's inadvertent physical harm to a bystander was part of that animal's normal response to the dog. It would make cattle ranch owners susceptible to strict liability whenever a herding dog's normal behavior directed toward a cow leads the cow to collide with and injure a ranch employee. Based on the history of the statute and the Legislature's prior acquiescence to our understanding of the statute's limited scope in light of such history, we cannot conclude that this was the Legislature's intent. We have never held that a dog's actions directed toward another animal can lead to strict liability under § 54-601 for bodily hurt to a person by way of such animal instrumentality.

[6] Perhaps Gunner's alleged act of nipping at a cow's heels is not properly characterized as "playful and mischievous," but it was nothing more than the normal behavior of

---

[30] See *Donner v. Plymate, supra* note 7.

a herding dog, which has never been considered vicious. In this case, unlike the cases where we have concluded that playful and mischievous acts do not fall under § 54-601(1)(b), the dog's acts were not even directed toward the entity suffering the bodily hurt. Gunner had no direct contact with Smith, and there is no evidence that Gunner's actions were in any way directed toward Smith. Indeed, this is our first occasion to address the applicability of § 54-601(1)(b) in circumstances where the dog's acts were directed solely toward its "ordinary prey" and harm to the animal is not the basis for the plaintiff's claim. Given that other words in § 54-601(1)(b)— "worrying" and "chasing" "any person or persons or any sheep or other domestic animals belonging to such person, firm, or corporation"—entail action directed toward the injured person or toward the injured animal owned by the damaged plaintiff, we hold that "injuring" must also be limited to bodily hurt caused by acts directed toward the person or animal hurt.

Even resolving every controverted fact in Smith's favor and giving him the benefit of every inference that can reasonably be deduced from the evidence,[31] there was no evidence that Gunner bit Smith, worried Smith, or chased Smith. And while Smith allegedly was hurt by a cow that was put in motion by Gunner, there was no evidence that Gunner's actions were directed toward Smith. There might be situations where a dog, in an act manifesting aggression toward a person, utilizes an instrumentality to cause the person bodily hurt, but this is not that case.

Whether Meyring should have foreseen that Gunner would attempt to herd cattle in an enclosed space and thereby injure one of its employees was a question of negligence that was properly presented to the jury. The district court did not err in concluding that the evidence presented did not fall within the purview of strict liability under § 54-601.

---

[31] See *Jacobs Engr. Group v. ConAgra Foods, supra* note 1.

## CONCLUSION

For the foregoing reasons, we affirm the district court's order granting a directed verdict in favor of Meyring on Smith's statutory strict liability claim.

AFFIRMED.

MILLER-LERMAN, J., concurring.

I do not read our opinion herein as necessarily endorsing the majority opinion in *Underhill v. Hobelman*, 279 Neb. 30, 776 N.W.2d 786 (2009), regarding "injuring" under § 54-601(1)(b), from which I dissented, and accordingly, I concur.