Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/27/2019 12:06 AM CST

Rickey Anderson and Lynnette Anderson,
appellees, v. Gregory J. Babbe,
M.D., et al., appellants.
___ N.W.2d ___

Filed October 4, 2019.    No. S-18-847.

1. **Motions for Mistrial: Appeal and Error.** Decisions regarding motions
   for mistrial are directed to the discretion of the trial court and will be
   upheld in the absence of an abuse of discretion.
2. **Jury Instructions.** The giving or refusing to give a cautionary instruc-
   tion that the jury is not to allow sympathy or prejudice to control or
   affect its finding is within the discretion of the trial court.
3. **Motions for New Trial: Appeal and Error.** An appellate court reviews
   a denial of a motion for new trial for an abuse of discretion.
4. **Directed Verdict: Appeal and Error.** In reviewing a trial court's rul-
   ing on a motion for directed verdict, an appellate court must treat the
   motion as an admission of the truth of all competent evidence submit-
   ted on behalf of the party against whom the motion is directed; such
   being the case, the party against whom the motion is directed is entitled
   to have every controverted fact resolved in its favor and to have the
   benefit of every inference which can reasonably be deduced from
   the evidence.
5. **Jurors: Damages.** A "Golden Rule" argument tells the jurors to place
   themselves in the plaintiff's shoes and award the amount they would
   "charge" to undergo equivalent disability, pain, and suffering.
6. **Jurors: Appeal and Error.** Although an invitation to jurors to put them-
   selves in the place of a party is improper argument, it is not a ground for
   a reversal unless the jurors were prejudicially affected by the remark.
7. **Juror Qualifications.** Parties may not use voir dire to impanel a jury
   with a predetermined disposition or to indoctrinate jurors to react favor-
   ably to a party's position when presented with particular evidence.
8. **Directed Verdict: Waiver: Appeal and Error.** When a defendant's
   motion for directed verdict made at the close of plaintiff's case is

overruled and the defendant introduces evidence in support of allegations contained in its answer, the defendant waives any right to insist that the court erred in overruling the motion.

9. **Directed Verdict: Appeal and Error.** A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

10. **Physicians and Surgeons: Expert Witnesses: Proof.** To establish the customary standard of care in a particular case, expert testimony by a qualified medical professional is normally required.

11. **Directed Verdict: Evidence.** A defendant, by introducing evidence after his or her motion for a directed verdict is denied, takes the chance that his or her evidence will aid the plaintiff's case.

12. **Evidence.** A plaintiff has a right to have the submission of his or her case determined from all of the evidence regardless of who introduces it.

Appeal from the District Court for Douglas County: Duane C. Dougherty, Judge. Affirmed.

Mary M. Schott and Joseph S. Daly, of Sodoro, Daly & Shomaker, P.C., L.L.O., for appellants.

Patrick J. Cullan and Joseph P. Cullan, of Cullan & Cullan, L.L.C., for appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

A patient sued his doctors and obtained a favorable jury verdict. The doctors contend that (1) an improper "Golden Rule" discussion occurred during voir dire and (2) the patient failed to establish a breach of the standard of care. Because the voir dire discussion did not rise to a Golden Rule exhortation, the court did not abuse its discretion in denying requests for a mistrial, curative instruction, and new trial. The court did not err in denying the doctors' motions for directed verdict: The doctors waived any error in the denial at the close of the

patient's case by presenting evidence, and evidence subsequently adduced established a breach of the standard of care. We affirm.

## II. BACKGROUND

### 1. Pleadings

Elisabeth L. Backer, M.D., and Gregory J. Babbe, M.D., practiced medicine in Omaha, Nebraska. They were employees of UNMC Physicians.

In November 2012, Backer and Babbe provided medical care and treatment to Rickey Anderson. On November 1, Backer saw Anderson for a red, swollen, right lower extremity. On November 6, Anderson was admitted to the Nebraska Medical Center. While hospitalized, he was under the care and treatment of Babbe. Anderson was discharged on November 10, and Backer thereafter continued to provide medical care regarding his right lower extremity. Neither Backer nor Babbe performed an x ray of Anderson's right lower extremity. Neither doctor reevaluated the diagnosis of cellulitis.

In January 2013, Anderson consulted with a podiatrist and was told that he had "Charcot foot." He was informed that if x rays had been taken in November 2012, the deformity would have been revealed and significant deterioration of his foot could have been prevented.

Anderson and his wife sued Backer, Babbe, and UNMC Physicians (collectively the doctors) for medical malpractice and loss of consortium. The doctors affirmatively alleged that they acted with the degree of care, skill, and knowledge ordinarily possessed by like physicians, under like circumstances, in Omaha.

### 2. Voir Dire

The matter proceeded to a jury trial. As we set forth in more detail in our analysis, the Andersons' counsel wished to talk with the venire about physical health and several prospective jurors discussed the importance of mobility. The doctors moved for a mistrial, but the court overruled the motion. It

also declined to give an admonishment or curative instruction at that time.

### 3. EVIDENCE AT TRIAL

The Andersons called two expert witnesses to testify during their case in chief. One was a podiatrist who treated Anderson and practiced in the Omaha area. Other than a 2-month rotation in residency, the podiatrist had never practiced family medicine. But the podiatrist was an adjunct clinical instructor who worked with residents from the University of Nebraska Medical Center during an elective rotation, and based on that, he was familiar with the material that family practice physicians training at the University of Nebraska Medical Center were to know with respect to foot care. The other expert was a family physician who was chairman of a community hospital in Baltimore, Maryland.

The podiatrist saw Anderson following a referral by Backer to the podiatrist's partner. The referral was for cellulitis and the removal of a toenail. The podiatrist opined that had the Charcot foot been diagnosed and treated appropriately on or prior to November 28, 2012, Anderson would not have suffered damage to his foot. The podiatrist explained how Charcot occurs in a patient with neuropathy: an event causes bones to release an osteoclast, the osteoclast releases a chemical that causes inflammation and redness, and "as the event occurs, you have two months to get it set up, immobilize it, [and] protect the foot." According to the podiatrist, if the foot is immobilized and the inflammation is allowed to resolve, the foot generally will not have a deformity. Having reviewed Anderson's records, the podiatrist testified that Anderson should have been immobilized and placed into a protective boot on November 1.

The podiatrist testified that based on an algorithm compiled by an international task force on Charcot foot, obtaining an x ray is the first thing that should be done if there is a clinical suspicion of a Charcot event. No x ray was taken until January 22, 2013. When asked if he had an opinion as to whether

the care Anderson received was malpractice, the podiatrist answered: "My opinion is it was a missed diagnosed Charcot and it was a mistake. So, unfortunately, that means it's malpractice, that we made a mistake and now there's damages that occurred because of our mistakes."

The family physician conducted a forensic review of the case. He explained that Anderson had a neuropathy, which put him at increased risk for developing a Charcot joint. Although Anderson presented himself with what may have "looked like a cellulitis," it did not "behave like a cellulitis." The family physician testified that "in a patient with neuropathy, who had these kinds of symptoms, I believe that [the doctors] needed to think about the possibility of a Charcot joint." He testified that it was unreasonable to not perform any x ray or MRI on Anderson on November 1, 2012, or thereafter. The following colloquy occurred between the Andersons' counsel and the family physician:

> Q. And do you have an opinion whether or not each and every one of the opinions you've proffered with respect to the violations of the standard of care independently was a — was a proximate cause of . . . Anderson's injuries?
>
> A. Yes.
>
> Q. So the failure to consider Charcot on each and every day was a cause of . . . Anderson's condition?
>
> A. I believe so, yes.
>
> Q. Well, alternatively, had they considered Charcot at any time in November, do you have an opinion whether or not we'd be here today, that he would have suffered the fractures, dislocations and subluxations that he did?
>
> A. From what I know about Charcot, if it's treated at Stage 0, it has an excellent prognosis.

After the Andersons rested, the doctors moved for a directed verdict. They asserted that neither of the Andersons' expert witnesses mentioned the words "'standard of care.'" The doctors noted that the family physician was never asked if he was familiar with the standard of care expected of family practice

physicians in Omaha, that the podiatrist was not asked if he knew what the standard of care was, and that neither expert testified that a breach of the standard of care occurred.

The court similarly did not recall hearing "the usual question point-blank." But the court remarked that the "substance of the testimony is really more important than the choice of words." The court overruled the motion for a directed verdict.

During the doctors' case in chief, the Andersons' counsel cross-examined Backer about the standard of care. Backer agreed that if a patient with neuropathy has symptoms wholly consistent with Charcot foot and if nothing is inconsistent with that condition, then the standard of care requires a physician to suspect Charcot foot. Backer recalled Babbe's testimony that Anderson's condition was wholly consistent with Charcot foot, that nothing was inconsistent with Charcot foot on November 6, 2012, and that Babbe did not consider Charcot foot. The Andersons' counsel then asked Backer, "Do you agree, based on that evidence, that . . . Babbe violated the standard of care?" The doctors' counsel objected, explaining that Backer had not been identified as an expert witness to testify as to anybody but herself. The Andersons' counsel directed the court to the doctors' third supplemental answers to interrogatories in which they designated their expert witnesses as "Dr. Frey" along with Babbe and Backer and stated that "they" would testify that "they" met the standard of care. The court overruled the objection.

Backer testified that when there is a clinical suspicion of Charcot foot, the standard of care required a specialty consultation with either an orthopedist or a podiatrist. Backer testified that based upon Babbe's testimony, he failed to meet the standard of care because he did not get any such specialty consultation. During questioning, Backer agreed that she was designated as an expert to defend the conduct of herself and Babbe.

Prior to seeing Anderson, Babbe spoke with Backer, who informed Babbe that Anderson had a foot infection that was

not improving. Babbe first saw Anderson on November 6, 2012. He diagnosed Anderson with cellulitis, and his diagnosis never changed. Babbe agreed that Anderson met the diagnostic criteria for Charcot foot every time Babbe saw him, and Babbe testified that he never ruled out Charcot foot. But Babbe testified that Anderson also had more swelling and redness up into his calf and responded to antibiotic treatment. According to Babbe, antibiotics will have no effect on redness caused by Charcot foot. Further, Babbe conducted a physical examination of Anderson's right foot and ankle on each of the 4 days that Babbe saw him and he never noted any abnormalities to the structure of the foot or ankle. Babbe testified that he was not negligent and did not commit malpractice.

At the close of all evidence, the doctors renewed their motion for directed verdict. The court denied the motion.

### 4. VERDICT

The jury found that the Andersons met their burden of proof against each doctor. The jury allocated 75 percent of the liability to Babbe and UNMC Physicians and 25 percent to Backer and UNMC Physicians. The jury determined Anderson's economic damages to be $100,000 and his noneconomic damages to be $500,000. The jury decided Anderson's wife's loss of consortium damages amounted to $200,000. The court entered judgment on the verdict for the Andersons in the amount of $800,000.

The doctors filed a motion for new trial or, alternatively, for judgment notwithstanding the verdict. The court denied the motion. The doctors filed a timely appeal, which we moved to our docket.[1]

### III. ASSIGNMENTS OF ERROR

The doctors assign three errors with respect to jury selection. They allege the court erred in (1) failing to grant a

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2018).

mistrial, (2) failing to give a curative instruction, and (3) overruling their motion for new trial.

The doctors also assign three errors related to the alleged failure of the Andersons to establish a breach of the standard of care. They claim that the court erred in (1) failing to grant their motion for directed verdict at the close of the Andersons' case in chief, (2) allowing questioning of Backer about the standard of care of Babbe, and (3) failing to grant their motion for directed verdict at the close of all evidence.

To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[2] The doctors did not specifically assign that the court erred in overruling their motion for judgment notwithstanding the verdict; thus, we do not address any argument concerning that motion.

## IV. STANDARD OF REVIEW

[1] Decisions regarding motions for mistrial are directed to the discretion of the trial court and will be upheld in the absence of an abuse of discretion.[3]

[2] The giving or refusing to give a cautionary instruction that the jury is not to allow sympathy or prejudice to control or affect its finding is within the discretion of the trial court.[4]

[3] An appellate court reviews a denial of a motion for new trial for an abuse of discretion.[5]

[4] In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor

[2] *Diamond v. State*, 302 Neb. 892, 926 N.W.2d 71 (2019).

[3] *Bank v. Mickels*, 302 Neb. 1009, 926 N.W.2d 97 (2019).

[4] See *Buhrman v. Smollen*, 164 Neb. 655, 83 N.W.2d 386 (1957).

[5] See *Bank v. Mickels, supra* note 3.

and to have the benefit of every inference which can reasonably be deduced from the evidence.[6]

## V. ANALYSIS

### 1. Golden Rule Discussion in Voir Dire

#### (a) Additional Facts

During voir dire, the Andersons' counsel informed the prospective jurors that they "are to look at the evidence objectively and weigh the evidence objectively." Counsel advised that "there's no sympathy that's to be allowed to enter into your deliberations or your thought process."

The Andersons' counsel wished to speak with the venire about physical health. He stated:

> Now I just want to talk about how important your physical health is to you, your ability to walk, your ability to climb stairs, your ability to do things of that nature, and I'll just go through each and every one of you and probably break here in a minute for — for the noon break.

At that point, counsel for the doctors objected. He asserted that the Andersons' counsel was improperly "trying to put the [prospective] jurors in the position of a party." The court overruled the objection.

Several prospective jurors then spoke of the importance of mobility. One said it "would be a hit for sure" if he were unable to "[r]un around like a chicken with my head cut off making people drunk." Another prospective juror stated that her health was very important and that she "would want to be able to keep working, moving, and walking, being mobile." A third prospective juror explained how his life would change if he were unable to work. A fourth discussed that it "would change a lot about [her] lifestyle." A fifth prospective juror stated that he is "constantly walking around." A sixth stated that mobility is "very important, not just from

---

[6] *Smith v. Meyring Cattle Co.*, 302 Neb. 116, 921 N.W.2d 820 (2019).

a quality-of-life aspect, but, yeah, being able to support your-self and your family." A seventh similarly stated that mobility is very important.

Immediately after the seventh's response, the court sug-gested a break for lunch and excused the prospective jurors. The record shows that at 11:55 a.m., in the presence of counsel and the parties but outside the presence of the prospective jury, the court addressed the objection made during voir dire. The court stated:

> [J]ust about five minutes ago or so, [the doctors' coun-sel] made an objection to [the Andersons' counsel's] last inquiry of a general question of each, which turned into a question of each of the jurors is how [the Andersons' counsel] was handling it. We got about five or six of them done before we broke for lunch, where the question was: How important is your general health? Which then got to a question of one of them: How important is your mobil-ity? [The doctors' counsel] objected. The Court made its ruling and basically overruled that objection.
>
> Now that the Court's thought about it a little more . . . , the Court's going to change that ruling, and I'm going to sustain [the doctors'] objection and not allow that question to be asked, when we return, of the remaining jurors. Okay?

The court explained its initial belief that the prospective jurors would merely confirm that their health is important. But the court recognized that "the answers were starting to get . . . towards how they would feel to . . . be in the shoes of [Anderson], which we don't allow to be argued at clos-ing." The court stated that "it's probably best I don't allow it to even be discussed in a voir dire." The doctors' counsel confirmed "that was my whole point when I made the objec-tion." He asserted that the Andersons' counsel was "arguing the case" and had put the prospective jurors in the place of Anderson. The doctors moved for a mistrial, which the court overruled.

The court stated that it would "keep an open mind" about giving "a limiting instruction if [counsel] felt, at the end of this matter . . . that needed to be discussed." The doctors' counsel asked the court "to instruct the jury and to make a comment to them at least" and to do so now rather than at the end of trial. The following colloquy occurred:

THE COURT: . . . [Y]ou want me to tell them something when they return?

[Counsel for the doctors]: Yeah, I want to tell them, you know, the questioning that they were asked, you know, that has nothing to do with how they feel. In other words, they can't put themselves in the place of a party to a lawsuit.

THE COURT: I understand.

[Counsel for the doctors]: And have that . . . cloud their . . . decision on whether or not there's any liability and, if so, what the damages are, if there — if there are any damages. I just think that something has to be said . . . to the jury. I don't know that you could — you know, the — the milk has been spilled. I don't know if you can get it back in the bottle or not, but —

THE COURT: Well, I'm not inclined to do that at this time. That's why I did bring it up, because I thought you might ask for that, and I may be inclined to do it as we get towards the end of this trial. I'm not so sure I see where we're in a worse position if I do it at the time of jury instructions as opposed to doing it at 1:00 when they return at voir dire. I don't know what worsens during that time is my point.

So if you want to approach it back up and write something up you may — you may read that would —

[Counsel for the doctors]: Well, I think I just kind of did tell you what I thought.

THE COURT: Then I'm not going to do it at this time, but I certainly will entertain that motion or that thought later in the matter.

### (b) Discussion

The doctors assign three errors related to voir dire. They argue that the court abused its discretion in overruling their motion for mistrial, in failing to give a curative instruction, and in overruling their motion for a new trial. Their arguments are premised upon a claim that the Andersons' counsel improperly invoked the Golden Rule during voir dire. We find no merit in any of the respects alleged.

[5,6] "A 'golden rule' argument tells the jur[ors] 'to place themselves in the plaintiff's shoes and award the amount they would 'charge' to undergo equivalent disability, pain and suffering.'"[7] Such an argument is improper because it asks the jurors to place themselves or their loved ones in the plaintiff's position, effectively urging them to become advocates for the plaintiff.[8] Although an invitation to jurors to put themselves in the place of a party is improper argument, it is not a ground for a reversal unless the jurors were prejudicially affected by the remark.[9] Golden Rule cases typically involve remarks made during closing arguments.[10]

[7] Golden Rule challenges have been directed occasionally to remarks during voir dire. Parties may not use voir dire to impanel a jury with a predetermined disposition or to indoctrinate jurors to react favorably to a party's position when presented with particular evidence.[11] In one case, a prosecutor asked prospective jurors questions such as whether they thought it was "'important to be able to feel safe and secure

---

[7] *Janice H. v. 696 North Robertson, LLC*, 1 Cal. App. 5th 586, 603, 205 Cal. Rptr. 3d 103, 119 (2016).

[8] See *id.*

[9] See *Paro v. Farm & Ranch Fertilizer*, 243 Neb. 390, 499 N.W.2d 535 (1993).

[10] See, R. Collin Mangrum, *I Believe, The Golden Rule, Send a Message, and Other Improper Closing Arguments*, 48 Creighton L. Rev. 521 (2015); Annot., 70 A.L.R.2d 935 (1960).

[11] *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

in [their] own home[s]' and 'to defend their child[ren] from danger,' and whether they had ever 'been jealous' or taken any 'sort of violent action' out of jealousy."[12] The appellate court reasoned that the open-ended voir dire questions were not improper Golden Rule questions. In another case, the plaintiffs' lawyer asked prospective jurors what they thought would be a fair amount of money for such a case and how they might feel if they lost a child.[13] The court stated that the Golden Rule arguably did not apply because questions asked during voir dire are not argument, and to the extent it did apply, the defendants were not unfairly prejudiced.

We find persuasive a case from the District Court of Appeal of Florida.[14] There, a prospective juror was asked whether she could conduct her family business without her spouse. The trial court initially sustained an objection to the question but denied a motion for mistrial. Later, the trial court granted a new trial, finding that the question was a Golden Rule argument. The appellate court disagreed. It observed that the question did not ask the prospective juror how much the juror would want to receive if placed in the plaintiffs' position nor did it ask the juror to identify with the plaintiffs' personal circumstances. The appellate court noted that at the time, the prospective jurors did not know anything about the facts of the case other than that the plaintiffs were suing because an accident killed a family member. The court reasoned that the question "asked what the juror's own personal circumstances were, which is the very reason for voir dire—to know whether something in the juror's personal experience is relevant to the issues to be tried in the case."[15]

---

[12] *Rasheed v. State*, 237 So. 3d 822, 830 (Miss. App. 2017).

[13] See *Heimlicher v. Steele*, 615 F. Supp. 2d 884 (N.D. Iowa 2009).

[14] *Goutis v. Express Transport, Inc.*, 699 So. 2d 757 (Fla. App. 1997), *disapproved on other grounds, Murphy v. International Robotic Systems*, 766 So. 2d 1010 (Fla. 2000).

[15] *Id.* at 761.

Here, the prospective jurors were informed that this was a medical malpractice action. But the venire was unaware of the particular facts of the case. The Andersons' counsel specifically told the prospective jurors: "[W]hat we're not allowed to do right now is tell you about the facts. We're not supposed to give you any information about the case itself." The prospective jurors were not asked to place themselves in Anderson's situation or asked how much they would want to be awarded if so placed. While the discussion during voir dire may have been heading in an improper direction, it did not reach the point of stating "put yourself in the plaintiff's place" or asking the prospective jurors to do so. We conclude the court did not abuse its discretion in overruling the doctors' motion for mistrial.

Nor did the court abuse its discretion in declining to give a curative instruction. The court's apprehension about making the situation worse with a curative instruction during voir dire was reasonable. The voir dire discussion was relatively undeveloped. At that point, a trial judge could reasonably conclude that an admonishment or instruction would highlight the issue by making a vague interpretation explicit.

The court left open the possibility of giving an instruction "at the time of jury instructions." There is no argument that a specific curative admonishment or instruction was offered and refused. And both the preliminary and final jury instructions given made clear that sympathy should not factor into the jury's decision. Prior to the introduction of evidence, the jury was told, "Do not allow sympathy or prejudice to influence you." Once the jury had heard all of the evidence, it was instructed, "You must not allow sympathy or prejudice to influence your verdict." Specifically with regard to damages, the jury was instructed: "Remember, throughout your deliberations you must not engage in any speculation, guess, or conjecture, and you must not award any damages by way of punishment or through sympathy."

For the same reasons discussed above with respect to the motion for mistrial and request for a curative instruction, we

conclude that the court did not abuse its discretion in overruling the doctors' motion for new trial.

## 2. MOTION FOR DIRECTED VERDICT AFTER ANDERSONS' CASE IN CHIEF

[8] The doctors argue that the district court erred in overruling their motion for directed verdict made after the Andersons' case in chief, but they waived any error by offering evidence. Over 100 years ago, this court declared that when a defendant's motion for directed verdict made at the close of the plaintiff's case was overruled and the defendant introduced evidence in support of allegations contained in its answer, it waived any right to insist that the court erred in overruling the motion.[16] This rule enjoys continued vitality.[17]

The doctors assert that "deciding whether to go forward with the trial puts defense counsel between the proverbial rock and a hard place."[18] But the rule they urge would allow them to "have [their] cake and eat it too." We decline their invitation to overrule this longstanding waiver rule.

The doctors also argue that case law indicates the first motion is not waived, but, rather, can be incorporated into the motion made at the close of all evidence. They misread the case law. A Missouri court cogently explained the effect of motions for directed verdict made at the close of the plaintiff's evidence and at the close of all evidence under its rule that governs motions for directed verdict, which is substantially similar to our Neb. Rev. Stat. § 25-1315.01 (Reissue 2016):

> At the close of plaintiff's evidence, Rule 72.01(a) provides defendant with the opportunity to challenge whether plaintiff has made a submissible case. If no further evidence is introduced, the case—both at trial and on appeal—is

---

[16] See *Bradstreet v. Grand Island Banking Co.*, 89 Neb. 590, 131 N.W. 956 (1911).

[17] See *Denali Real Estate v. Denali Custom Builders*, 302 Neb. 984, 926 N.W.2d 610 (2019).

[18] Reply brief for appellants at 10.

> determined by the evidence on the record at that point. Should the trial court overrule the motion, defendant then has the choice of putting on evidence of his or her own. If defendant introduces evidence, the state of the record at the close of plaintiff's case is waived and the case—both at trial and on appeal—is determined in accordance with all evidence admitted: plaintiff's *and* defendant's. Rule 72.01(b) allows defendant the opportunity to move for a directed verdict at the close of all evidence.[19]

The state of the record at the close of the plaintiff's case ceases to be relevant (for purposes of a directed verdict) if the defendant introduces evidence.

An Arkansas court considering a similar issue in a medical malpractice action found a waiver.[20] In that case, the appellee argued that the assigned errors were immaterial, because the trial court should have directed a verdict for him. The appellee's argument was premised on the plaintiff's failure to prove by expert testimony that the doctor failed to meet the degree of skill ordinarily used by other doctors in the locality. But the appellate court did not reach the argument, because rather than standing on the motion for a directed verdict at the close of the plaintiff's proof, the appellee instead introduced testimony. The appellate court determined that the appellee waived his motion by not electing to stand on it.

Because the doctors in the instant case introduced evidence after the court denied their motion for directed verdict at the close of the Andersons' case in chief, they have waived any error in the ruling.

### 3. QUESTIONING REGARDING STANDARD OF CARE

The doctors argue that the court erred in allowing questioning of Backer about whether Babbe met the standard of care.

---

[19] *Sanders v. Ahmed*, 364 S.W.3d 195, 207 (Mo. 2012) (emphasis in original).

[20] See *Haney v. DeSandre*, 286 Ark. 258, 692 S.W.2d 214 (1985).

They contend that Backer was not identified as an expert witness as to compliance with the standard of care for anyone other than herself.

In asking Backer questions about whether Babbe met the standard of care, the Andersons' counsel pointed to an interrogatory answer submitted on the doctors' behalf in which the doctors designated their expert witnesses as themselves and a third doctor. The answer stated that "they" would testify "they" met the standard of care. Assuming without deciding that the doctors' answers to interrogatories are sufficiently in our record, it cannot come as a surprise for a party opponent to be called to testify.

The doctors direct our attention to *Simon v. Drake*.[21] In that case, we concluded that the trial court erred in permitting a surgeon—the plaintiff's treating physician—who had not been designated as an expert to testify about standard of care issues and in refusing to give a curative instruction to the jury. We reasoned that "[c]ompared to the testimony of a hired expert, a juror was likely to give great weight to [the surgeon's] opinion because he was [the plaintiff's] treating physician and testifying as an expert against his own patient."[22] But here, unlike in *Simon*, Backer had been designated as an expert with regard to standard of care issues. We see no error.

### 4. MOTION FOR DIRECTED VERDICT
### AFTER CLOSE OF ALL EVIDENCE

[9] The doctors also argue that their motion for directed verdict made at the close of all evidence should have been sustained. A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[23]

---

[21] *Simon v. Drake*, 285 Neb. 784, 829 N.W.2d 686 (2013).

[22] *Id.* at 794, 829 N.W.2d at 693.

[23] *Denali Real Estate v. Denali Custom Builders, supra* note 17.

[10] The doctors contend that the Andersons failed to establish the applicable standard of care, that their experts were familiar with the applicable standard of care, and that a breach of the applicable standard of care occurred. To establish the customary standard of care in a particular case, expert testimony by a qualified medical professional is normally required.[24] Often, such testimony is premised on the expert's personal knowledge of, and familiarity with, the customary practice among medical professionals in the same or similar locality under like circumstances.[25]

The doctors' argument is based on their belief that the Andersons' experts failed to state that they were familiar with the standard of care applicable to physicians practicing family medicine in Omaha in November and December 2012 treating a patient such as Anderson. In other words, they ask us to consider only the expert testimony presented by the Andersons during their case in chief.

[11,12] But on a motion made at the close of all evidence, our review is not limited in that way. "The defendant, by introducing evidence after his or her motion for a directed verdict is denied, takes the chance that his or her evidence will aid the plaintiff's case."[26] "The plaintiff has a right to have the submission of his or her case determined from all of the evidence regardless of who introduces it."[27] The doctors' evidence clearly established a violation of the standard of care. Accordingly, the court properly denied the doctors' motion for directed verdict at the close of all evidence.

## VI. CONCLUSION

We conclude that the voir dire discussion did not constitute a Golden Rule argument and that the court did not abuse its

---

[24] *Hemsley v. Langdon*, 299 Neb. 464, 909 N.W.2d 59 (2018).

[25] *Id.*

[26] 89 C.J.S. *Trial* § 1353 at 770-71 (2012).

[27] *Id.* at 771.

discretion in denying the doctors' request for a mistrial, for an admonishment or curative instruction during voir dire, or for a new trial. Because the doctors presented evidence following the denial of their motion for directed verdict at the close of the Andersons' case in chief, they waived any error in the denial. And because the evidence—including the cross-examination of Backer—established a breach of the standard of care, the court did not err in denying the motion for directed verdict at the close of all evidence. We affirm the judgment of the district court.

AFFIRMED.