Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/02/2021 08:08 AM CDT

STATE OF NEBRASKA, APPELLEE, V. ALEJANDRO
GARCIA PRADO, APPELLANT.
___ N.W.2d ___

Filed October 12, 2021.    No. A-20-815.

1. **Effectiveness of Counsel: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.

2. ____: ____. Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.

3. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

4. **Effectiveness of Counsel: Claims.** A claim of ineffective assistance that is insufficiently stated is no different than a claim not stated at all.

5. **Jurors: Damages.** A Golden Rule argument that tells jurors to place themselves in the plaintiff's shoes and award the amount they would charge to undergo equivalent disability, pain, and suffering is improper because it asks the jurors to place themselves or their loved ones in the plaintiff's position, effectively urging them to become advocates for the plaintiff.

6. **Juror Qualifications.** Parties may not use voir dire to impanel a jury with a predetermined disposition or to indoctrinate jurors to react favorably to a party's position when presented with particular evidence.

7. **Effectiveness of Counsel.** As a matter of law, counsel is not ineffective for failing to make a meritless objection.

8. **Evidence: Words and Phrases.** Cumulative evidence means evidence tending to prove the same point of which other evidence has been offered.

9. **Trial: Evidence: Appeal and Error.** Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

10. **Evidence: Words and Phrases.** Evidence which is not relevant is inadmissible. To be relevant, evidence must be probative and material.

11. **Rules of Evidence.** Under Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

12. **Effectiveness of Counsel: Proof.** To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

13. **Right to Counsel: Appeal and Error.** An appellate court reviews a trial court's rulings on motions to withdraw as counsel and motions to dismiss appointed counsel and appoint substitute counsel for an abuse of discretion.

14. **Criminal Law: Appeal and Error.** A defendant in a criminal case may not take advantage of an alleged error which the defendant invited the trial court to commit.

15. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

16. **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.

17. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** For purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), interrogation refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

18. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

19. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

20. **Trial: Evidence.** The principle of opening the door is simply a contention that competent evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue.

21. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

22. **Sentences: Appeal and Error.** When a trial court's sentence is within the statutory guidelines, the sentence will be disturbed by an appellate court only when an abuse of discretion is shown.

23. **Judgments: Appeal and Error.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and Nathan J. Sohriakoff for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Alejandro Garcia Prado appeals his conviction and sentence in the district court for Lancaster County for first degree

sexual assault. He argues multiple ineffective assistance of counsel claims, along with claims that the district court erred in both procedural and evidentiary matters. Prado also assigns that there was insufficient evidence for his conviction and that the sentence imposed was excessive. We affirm.

## II. BACKGROUND

On March 9, 2018, the victim, D.A., and her friend, Gwen P., each consumed three to four shots of vodka at D.A.'s apartment around 11 p.m. before going to a local club at approximately midnight. D.A.'s friend, Brenden J., met her at the club with two other male friends about 30 minutes later. While at the club, D.A., Gwen, and Brenden each consumed more alcohol. At approximately 2:30 a.m., the group returned to D.A.'s apartment. D.A., Brenden, Gwen, and one of Brenden's friends each had one to two beers at the apartment, and the group decided to order pizza. At 2:44 a.m., the group ordered a pizza delivery, for which Brenden paid.

Prado arrived at the apartment to deliver the pizza, at which point Brenden informed Prado he did not have cash for a tip but offered Prado a beer in lieu of the tip. Prado accepted, drank the beer at the door to the apartment, and then offered to come back when his shift ended with "a bottle and a pizza." Although Prado testified the group invited him to return, Brenden testified that he remembered hinting to Prado that he did not need to return, because they were just going to eat the pizza and go to bed. Regardless, Brenden and Prado exchanged phone numbers, and Prado said he would return in 20 minutes. Brenden told Prado that the group was tired and that they "probably weren't gonna be up much longer." Brenden did not receive a phone call from Prado later that night.

The witnesses' testimonies conflict at this point, but generally, D.A. and her friends testified that Gwen and D.A. went to sleep and the three male friends left soon thereafter, somewhere between 4 and 7 a.m. Brenden was the last one out of the apartment, and although he believed he would have turned

off the apartment lights, he could not confirm that he did. He did not believe the music was still playing but was certain that he closed the apartment door. He testified that he did not have a key to lock the front door from the outside.

Prado testified that he returned to D.A.'s apartment when he clocked out of work around 4:30 a.m. According to him, the lights and music were still on, so he knocked and "a brunette answer[ed] the door" and let him into the apartment. He then followed her into the bedroom, where a woman with blond hair was lying on the bed. Prado explained that he climbed into bed between the two women because he thought, "well, hey, if I'm in the middle maybe I might get lucky and have a threesome." Prado claimed that D.A., the woman with blond hair, then kissed him and began stroking his genitals over his pants. Prado admitted to kissing D.A.'s neck. He claimed that D.A. then pulled her pants down, which he believed to be an indication that she wanted to have vaginal intercourse with him. Prado testified that he began to position himself to have intercourse with D.A., but he prematurely ejaculated. D.A. left to use the bathroom, and Prado turned his attention to Gwen, who told him to leave. He denied he ever put his fingers or penis in D.A.'s vagina.

D.A., however, testified that she did not recall hearing a knock at the front door or letting anybody into her apartment; rather, she awoke to feeling someone "touching" and "caress[ing]" her buttocks. She knew the person touching her was lying between her and Gwen on the bed, although she could not see who it was because the lights were off. She "could feel fingers" moving "in and out of [her] vagina." She explained that she thought the person touching her was Brenden, but was confused because they did not have that type of a relationship. While this was happening, she was "half asleep, half awake."

Gwen testified that she woke up and heard D.A. making "sexual noises" and that the latter was "moaning and stuff." Gwen explained that a bathroom light was on, casting light

into the bedroom. She turned and saw D.A. was rocking from her back to her side while making the sounds. Gwen remained lying down on the bed and staring at D.A., when she saw black hair and noticed a male's hand was under the bed cover. Gwen perceived the male's hand to be around the area of D.A.'s genitals, and she then "heard him get on top of [D.A.]."

D.A. explained that she "wasn't really resisting, just because [she] was still kind of in that half-asleep/half-awake state." When she felt a "graze" on her leg that felt like a penis, she pushed it away. At that point, she got up to go to the bathroom because she "didn't want that to go on for any longer, obviously," since she did not want to have sex with Brenden. Gwen testified that she heard D.A. twice ask, "'What's going on?'" before getting up and going to the bathroom. D.A. explained she did not want to have sex with either Brenden or Prado that night.

After approximately 5 minutes in the bathroom, D.A. returned to the bedroom and saw Gwen sitting alone on the bed, looking "shocked and scared." Gwen was "100 percent sure" that the man had not been Brenden and asked D.A. who it was. D.A. testified that at that point, she thought the man had been Brenden, but that they walked around the apartment to make sure no one else was there. D.A. did not immediately call the police.

The next afternoon, D.A. called the pizza restaurant to ask who had delivered the pizza to her apartment the previous night and was advised that it was Prado. A security guard with whom D.A. had discussed the incident reported it to the police; they came to talk with her while she was at work that same day.

After her shift ended around 9:30 p.m., D.A. went to the police station to talk with an investigator, Tu Tran. The police retrieved D.A.'s bedsheets, her comforter, and what she had worn at the time of the incident. A "SANE" examination was conducted that revealed a 1.5- by 0.75-centimeter circular bruise and abrasion to the right side of D.A.'s neck,

lateral to her trachea. The examination also revealed abrasions to her vagina and hymenal tissue. The nurse who conducted the examination testified that these abrasions could be "fairly normal injuries to see in a digital penetration incident." She also admitted, however, that such injuries could come from consensual sex. No semen was detected on the vaginal swabs retrieved during D.A.'s examination. Swabs taken from a bruise on D.A.'s neck included Prado's DNA. Prado could not be excluded as the major contributor from semen samples found in D.A.'s underwear.

The police located Prado and subsequently interrogated him at the police station on March 19, 2018. A duty commander, Capt. Robert Farber, testified that Prado "was not free to go" and that while Prado was tired and spoke of having a learning disability, Farber did not notice anything to indicate that Prado had difficulty understanding or communicating with him. While in police custody, Farber read Prado his *Miranda* rights, but did not have a pen to fill out the form. When Tran arrived, Farber gave him the blank form and told Tran that Farber had gone through the form with Prado but did not fill it out due to the lack of a pen. Tran confirmed with Prado that he had answered "yes" to all of the questions on the *Miranda* rights form. Tran filled out the form, which Prado signed.

Following a jury trial, Prado was convicted of first degree sexual assault, a Class II felony punishable by 1 to 50 years' imprisonment. See, Neb. Rev. Stat. § 28-319 (Reissue 2016); Neb. Rev. Stat. § 28-105 (Cum. Supp. 2020). The district court sentenced Prado to 24 to 26 years' imprisonment, along with lifetime community supervision, and it required Prado to register under Nebraska's Sex Offender Registration Act. See, Neb. Rev. Stat. § 83-174.03 (Cum. Supp. 2020); Neb. Rev. Stat. § 29-4001 (Reissue 2016). Prado appeals.

## III. ASSIGNMENTS OF ERROR

Prado assigns that he received ineffective assistance of counsel in numerous respects. He also assigns that the district

court erred in (1) appointing new counsel after the verdict but before sentencing, (2) denying his motion to suppress, (3) granting the State's motion to offer Neb. Rev. Stat. § 27-414 (Reissue 2016) evidence, and (4) denying his motion to offer Neb. Rev. Stat. § 27-412 (Reissue 2016) evidence. Finally, he assigns that there was insufficient evidence for his conviction and that his sentence was excessive.

## IV. ANALYSIS

### 1. Ineffective Assistance of Counsel

[1] Prado is represented on appeal by different counsel than the counsel who represented him in the district court. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015). Therefore, Prado timely raised his claims of ineffective assistance of counsel.

### (a) Standard of Review

[2] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

### (b) Discussion

[3] To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Anderson*, 305 Neb.

978, 943 N.W.2d 690 (2020). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide deficient performance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.* The record on direct appeal is sufficient to review a claim of ineffective assistance of trial counsel if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Prado makes multiple assertions regarding ineffective assistance of his trial counsel. We address each of them in turn.

### (i) Failure to Allow Prado to Testify About D.A.'s Request for Oral Sex

Prado first asserts that his counsel failed to allow him to testify that D.A. requested he perform oral sex on her. According to Prado, his refusal to honor her request angered D.A. and such testimony "would have informed the jury on the question of consent." Brief for appellant at 15. However, Prado testified on both direct examination and cross-examination that he believed D.A. was upset with him because he prematurely ejaculated and took the pizza and alcohol with him when he left the apartment. He also testified extensively as to D.A.'s actions that would support a finding of consent if the jury had believed him; he detailed D.A.'s movements, including the removal

of her pants and the repositioning of herself for "penile-vaginal sex" just before Prado prematurely ejaculated. Although he argues that he was "ripped of his opportunity to present the jury with his side of the story in its entirety," he did present evidence from which a jury could have determined the contact was consensual, if believed. Brief for appellant at 16.

Because the record refutes Prado's claim that he was deprived of his ability to address the issue of consent, his counsel was not ineffective for failing to elicit testimony regarding D.A.'s alleged request for oral sex.

### (ii) Failure to Cross-Examine D.A. About Her Request for Oral Sex

Prado asserts that his trial counsel was ineffective for refusing to cross-examine D.A. about her request that Prado perform oral sex on her. Similar to the argument above, he claims that such cross-examination would have directly addressed the issue of consent in this case, and that the failure to question D.A. about this topic was a violation of his Sixth Amendment right to confrontation. We disagree.

[4] Prado does not state how D.A.'s response would have addressed the issue of consent. The Nebraska Supreme Court has found that a claim of ineffective assistance that is insufficiently stated is no different than a claim not stated at all. *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019). In *Stelly*, the defendant claimed his trial counsel was ineffective for failing to ask questions of the State's witnesses that would have shown a break in the chain of custody of certain evidence recovered from the crime scene. However, the Supreme Court found that because the defendant did not allege how the witnesses' testimony would reveal such a break, the defendant failed to allege his claim of deficient performance with sufficient particularity. See *id.*

Similarly to the defendant in *Stelly*, Prado fails to allege with sufficient particularity how D.A.'s testimony would reveal that the encounter was consensual. He does not claim that she would have admitted that she requested oral sex, and given

her testimony on direct examination, it is likely that she would have denied having done so. Therefore, Prado failed to allege this claim of deficient performance with sufficient particularity. See *State v. Stelly, supra*.

### (iii) Failure to Impeach Witnesses
### Rather Than Refresh Recollection

Prado assigns that his trial counsel was ineffective for failing to impeach D.A. and Gwen at various points in the trial with their prior inconsistent statements rather than refreshing their recollections. Prado relies on *Moffett v. Kolb*, 930 F.2d 1156 (7th Cir. 1991), to support his argument. We find his reliance misplaced.

In *Moffett v. Kolb, supra*, a police report contained a statement by a witness that he had seen someone other than the defendant holding a gun immediately after it was fired. At trial, the witness expressly denied making this statement to the police, but the police report containing the statement was never produced at trial. The court determined that although the witness' testimony made the jury aware that a discrepancy regarding whether or not he saw someone else holding the gun may exist, defense counsel's failure to produce the police report rendered the witness' statement that he had never seen the other person with the gun completely trustworthy. See *id*. The court found that if the witness had been impeached with his prior statement, the jury would have been required to assess his credibility. Therefore, defense counsel was ineffective for failing to properly impeach him with the police report.

We find the present case distinguishable from *Moffett v. Kolb, supra*. Here, Prado's counsel not only brought attention to the inconsistencies between what D.A. and Gwen said in their prior statements and what they said at trial, but he also produced their prior statements, had the witnesses read them silently, and then made them confront the inconsistencies. Because the witnesses were confronted with their prior statements, we do not believe that impeaching them would

have resulted in a different outcome in the trial. See *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020).

Because Prado can show no prejudice as a result of his trial counsel's choice to refresh D.A.'s and Gwen's recollections, this claim of ineffective assistance of counsel fails. See *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019).

### (iv) Failure to Object and Move for Mistrial During Voir Dire

Prado assigns that his trial counsel was ineffective for failing to object and move for a mistrial when the State asked a venireperson how he would feel if he were asked to describe his last consensual sexual encounter to the other potential jurors. Prado claims this question asks the venire to put themselves "in the shoes" of D.A., brief for appellant at 20, and therefore, the State improperly invoked the Golden Rule.

[5] As explained by the Supreme Court:

"A 'golden rule' argument tells the jur[ors] 'to place themselves in the plaintiff's shoes and award the amount they would 'charge' to undergo equivalent disability, pain and suffering.'" Such an argument is improper because it asks the jurors to place themselves or their loved ones in the plaintiff's position, effectively urging them to become advocates for the plaintiff.

*Anderson v. Babbe*, 304 Neb. 186, 197, 933 N.W.2d 813, 821 (2019).

[6] As applied to voir dire, the Supreme Court noted that "[p]arties may not use voir dire to impanel a jury with a predetermined disposition or to indoctrinate jurors to react favorably to a party's position when presented with particular evidence." *Id.* The Supreme Court noted, and found persuasive, a case from the District Court of Appeal of Florida, in which a venireperson was asked if she would be able to conduct her family business without her spouse. See *Goutis v. Express Transport, Inc.*, 699 So. 2d 757 (Fla. App. 1997), *disapproved on other grounds, Murphy v. International Robotic Systems*, 766 So. 2d 1010 (Fla. 2000). The Florida appellate

court disagreed with the trial court's ruling that the question violated the Golden Rule argument.

The Florida appellate court found that the question did not ask the prospective juror how much the juror would want to receive if placed in the plaintiffs' position nor did it ask the juror to identify with the plaintiffs' personal circumstances. The Florida appellate court found that "the question 'asked what the juror's own personal circumstances were, which is the very reason for voir dire—to know whether something in the juror's personal experience is relevant to the issues to be tried in the case.'" *Anderson v. Babbe*, 304 Neb. at 198, 933 N.W.2d at 822, quoting *Goutis v. Express Transport, Inc., supra*.

In *Anderson v. Babbe, supra*, the Supreme Court noted that the venirepersons had been informed that the case was one of medical malpractice but were unaware of the particular facts. They had not been told to place themselves in the plaintiff's situation or asked how much they would want to be awarded if so placed. See *id.* The Supreme Court specifically noted that "[w]hile the discussion during voir dire may have been heading in an improper direction, it did not reach the point of stating 'put yourself in the plaintiff's place' or asking the prospective jurors to do so." *Id.* at 199, 933 N.W.2d at 822.

[7] Likewise, we find the voir dire question at issue does not violate the Golden Rule argument. The particular venireperson was asked how he would feel describing his last consensual sexual encounter in front of a group of strangers. He was not asked to put himself in a situation in which he was sexually assaulted. We acknowledge Prado's argument that the potential jurors knew a few additional generalities of the case, including the allegation that he delivered a pizza to D.A.'s apartment and then came back later in the night when the sexual assault occurred, but we do not find that this rises to the level of a Golden Rule issue. Rather, as evidenced by the questions that followed, the initial question was posed to elicit how one would feel while testifying on the topic and what the physical manifestations of those feelings may look like. Because

neither an objection nor a motion for mistrial would have been successful, counsel cannot be ineffective for failing to have objected. See *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020) (as matter of law, counsel is not ineffective for failing to make meritless objection).

### (v) Failure to Object and Move for Mistrial
### Due to State's Improper Impeachment

Prado argues that his trial counsel was ineffective for failing to object to the State's improper impeachment of Gwen. He claims that the witness was allowed to read her prior statement into the record, without objection. We find that the record refutes this assertion.

The exchange in question during the State's direct examination of Gwen is as follows:

Q Do you recall telling Investigator Tran that you and [D.A.] took a Lyft to [the club]?

A That part, I don't really remember. I remember we got — we got a ride, 'cause we couldn't drive. I know [Brenden], for sure, drove us home, but it was either a Lyft or we got a ride there. That part is a little fuzzy.

Q Okay. If I showed you your statement to Investigator Tran, would that help refresh your memory?

A Yes, probably.

Q All right. [Gwen], I'm showing you what's page 6 of your statement. If you could just read the entire page, and let me know when you're done.

A In my head?

Q Yes, in your head.

A (Witness examining document.)

Yeah, that makes sense. I also think I have a video of us from that night, getting in a Lyft. It's just a car, so, like, I couldn't really remember if we got a ride or if it was a Lyft, but we Lyft a lot, so that makes sense.

The record does not indicate that Gwen read any portion of her statement into the record; rather, it shows that Gwen read the relevant portion silently and then answered the State's

pending question. Therefore, the record refutes Prado's assertion that Gwen was improperly impeached and counsel could not have been ineffective for failing to object. See *State v. Anderson, supra*.

### (vi) Failure to Object and Move for Mistrial Due to Brenden's Inadmissible Hearsay

Prado argues that his trial counsel was ineffective for failing to object to a portion of Brenden's testimony as inadmissible hearsay. While we agree that the testimony contained hearsay, it was cumulative of other admissible evidence; therefore, Prado is unable to prove that he was prejudiced by its admission. See *State v. Ildefonso*, 262 Neb. 672, 634 N.W.2d 252 (2001).

The exchange in question during Brenden's direct examination by the State was as follows:

Q . . . Was that topic of conversation that you and [D.A.] talked about whether or not it was you who came back in the middle of the night and was in her room in her bed?

A As far as me or — I remember her texting me asking if anyone else had came [sic] over or we invited anyone else over after, but as far as like the texting-wise, I knew at first she thought that it was me that we had stayed there or something along those lines, and then that's when Gwen had mentioned to her like that definitely wasn't [Brenden].

Hearsay, in relevant part, is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Rev. Stat. § 27-801(3) (Reissue 2016). Brenden's statement contains hearsay to which Prado's trial counsel could have objected. However, Gwen also testified that she told D.A. that the person on the bed was not Brenden, and Prado, himself, admitted to being the person on the bed. These statements were admitted into evidence without objection; therefore, the hearsay statement was cumulative.

[8,9] Cumulative evidence means evidence tending to prove the same point of which other evidence has been offered. *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014). Generally, erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Ildefonso, supra*. Because Brenden's hearsay statement was cumulative of other admitted evidence, Brenden's statement is harmless error, and Prado is unable to prove he was prejudiced by counsel's failure to object. See *id*.

### (vii) Failure to Object and Move for Mistrial Based on Testimony Regarding Prado's Appearance and Work History

Prado argues that his trial counsel was ineffective for failing to object on relevancy grounds and move for a mistrial when Prado's supervisor testified that Prado "looked pretty rough" most of the time and would periodically stop "showing up" for work. Prado claims the evidence was both irrelevant and unfairly prejudicial.

[10] Evidence which is not relevant is inadmissible. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). To be relevant, evidence must be probative and material. *Id.* Evidence is probative if it has any tendency to make the existence of a fact more or less probable than it would be without the evidence. *Id.* A fact is material if it is of consequence to the determination of the case. *Id.*

We agree with Prado that his supervisor's testimony was not relevant, as it was neither probative nor material to the elements of first degree sexual assault. However, we find this record is sufficient to conclude that Prado was not prejudiced by counsel's alleged deficient performance. Prado cannot show he was deprived of a fair trial or demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019). Here, as in *Stelly*, the testimony regarding the personal attributes of the

defendant was a small part of an otherwise lengthy trial in which there was strong evidence of his guilt.

[11] Prado also argues that even if the testimony was relevant, it was unfairly prejudicial. Under Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. To show prejudice, it must be shown that a motion under § 27-403 should have resulted in the evidence in question's being ruled inadmissible and that, without such evidence, there is a reasonable probability of a different outcome in the trial. *State v. Sierra*, 305 Neb. 249, 939 N.W.2d 808 (2020).

As stated above, the supervisor's testimony as to Prado's appearance and work history was irrelevant; therefore, § 27-403 is inapplicable. Regardless, because we determine that the evidence did not affect the outcome of the trial, even under § 27-403, this argument fails.

### (viii) Failure to Object and Move for Mistrial on Grounds of Relevancy Due to Testimony on Prado's Homelessness

Prado argues that his trial counsel was ineffective for failing to object on relevancy grounds and move for a mistrial when Prado's supervisor testified that Prado was homeless at the time of the incident. Prado claims that his living situation at the time of the incident was irrelevant, and its probative value was substantially outweighed by its prejudicial nature. However, Prado similarly testified on direct examination that he was living in his car and showering at friends' houses. This testimony negates any potential prejudice in the supervisor's cumulative testimony as to Prado's homelessness. See *State v. Ildefonso*, 262 Neb. 672, 634 N.W.2d 252 (2001). Therefore, his claim that counsel was ineffective for failing to object or move for a mistrial based on his supervisor's testimony fails. See *id.*

Prado also argues that even if the evidence was relevant, its relevancy was outweighed by the danger of unfair prejudice

under § 27-403, and that his counsel was ineffective for failing to raise this objection. However, Prado failed to assign this as error; therefore, we do not consider it. See *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016) (for alleged error to be considered by appellate court, appellant must both assign and specifically argue alleged error).

### (ix) Failure to Move to Strike Questions and Testimony After Trial Court Sustained Hearsay Objections

Prado asserts that his trial counsel was ineffective on multiple occasions for failing to move to strike sustained hearsay testimony from the record. Prado asserts that "both the question and the answer remain in the record for the jury to consider" and that "these improper questions that were sustained by the hearsay objection continue to be a part of the record, which prejudice [Prado] tremendously." Brief for appellant at 29.

Three of the hearsay statements Prado claims were improperly retained in the record include two statements from D.A. and one from Gwen, each of which Prado corroborated during his own testimony. Because the hearsay statements were cumulative of other evidence, Prado cannot prove he was prejudiced by counsel's failure to have them stricken.

The first statement involved the conversation at the apartment door between Prado and Brenden, but the objection was sustained before D.A. finished her answer and both Prado and Brenden testified as to the substance of that conversation. The second statement involved a comment made by Gwen to D.A. about the identity of the person on the bed, but the objection was sustained before D.A. identified Prado. Regardless, Prado admitted he was the person on the bed. The third statement was a reiteration by Gwen of Brenden's statement that the delivery man said he would return with pizza and alcohol. Both Brenden and Prado testified as to this conversation between the two of them.

Because each of the hearsay statements was cumulative to other testimony, no prejudice can be shown, negating any

claim of ineffective assistance of counsel for failing to move to strike them. See *State v. Ildefonso, supra*.

Four additional statements that Prado's trial counsel failed to move to strike were not prejudicial to Prado, and therefore, counsel was not ineffective for failing to have them stricken. These statements involve D.A.'s testimony that Gwen told her that Gwen went to bed shortly after D.A. did; Brenden's friend's statement that he did not know what the pizza delivery man said to Brenden; Gwen's testimony that D.A. told her, "'I'm kind of worried about last night'"; and Brenden's testimony that D.A. sent him a text message the next day inquiring about the previous night's events.

[12] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). There is no reasonable probability that if any of these statements were removed from the record that the jury would have acquitted Prado. Thus, Prado's trial counsel was not ineffective in failing to move to strike any of these statements.

Prado also asserts his counsel was ineffective for failing to strike the questions that led to the sustained objections. He cites *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017), in which the Supreme Court determined that a defendant could not show he was prejudiced by his counsel's failure to have such questions stricken because the jury was instructed that it could not speculate as to the possible answers. Prado claims that the jury in his case was not so instructed. However, jury instruction No. 1, read to the jury, contains the identical admonition. Therefore, we reject this claim.

### (x) Failure to Object to Hearsay Evidence During Witnesses' Testimony

Prado's claims that his trial counsel was ineffective for failing to object to hearsay evidence during the testimony of "the witnesses." Brief for appellant at 29. However, his

argument references only two instances of inadmissible hearsay during Gwen's testimony; therefore, we limit our analysis to those specific instances.

Prado specifically references Gwen's testimony regarding the conversation between Brenden and Prado in which Prado indicated that he could return to the apartment with "free alcohol and pizza," although Gwen admitted she did not personally hear Prado say this. While Gwen's statement is inadmissible hearsay as defined by § 27-801(3), both Brenden and his friend testified to the same conversation, thereby making the evidence cumulative. The submission of cumulative evidence regarding the conversation to which Gwen testified negates any potential prejudice in Gwen's testimony as to this conversation. See *State v. Hibler*, 302 Neb. 325, 923 N.W.2d 398 (2019).

Prado also argues that his trial counsel should have objected during the direct examination of Gwen, when the State asked, "At some point the next day, do you learn that [D.A.] has reported this incident to police?" and Gwen responded that D.A. "had told me that she wanted to, and I said we should, so we did." While this particular testimony from Gwen fits within the definition of hearsay, nothing about the statement is prejudicial to Prado. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Mrza, supra*. D.A. had already testified that she decided to tell the police about the incident, and Tran later testified that D.A. reported the incident to him. Nothing about this statement indicates that but for its admission, Prado would not have been convicted of the crime; as such, Prado cannot show prejudice, making the argument meritless that his trial counsel was ineffective.

## 2. Appointment of New Counsel Postverdict and Presentencing

Prado argues that the district court erred in appointing new counsel after the verdict but before Prado's sentencing

hearing. He claims he was prejudiced by this action, as his "sentencing was a month away and new counsel did not know the facts of the case, nor was he present at trial." Brief for appellant at 31. Because Prado acquiesced to this request, we reject his argument.

### (a) Standard of Review

[13] An appellate court reviews a trial court's rulings on motions to withdraw as counsel and motions to dismiss appointed counsel and appoint substitute counsel for an abuse of discretion. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

### (b) Discussion

On September 19, 2019, the day after jury deliberations began, Prado requested that he be allowed to represent himself because he did not believe his counsel properly presented the facts. The court cautioned Prado about the dangers of representing himself because there may be certain motions to be filed after the jury returned its verdict. After being advised by the court, Prado responded that he did not want to make a motion to have his counsel removed.

Immediately after the jury returned its guilty verdict on September 19, 2019, Prado's trial counsel motioned to withdraw as counsel because Prado was "not satisfied" with counsel and "basically made allegations [of] ineffective[ness]." Prado affirmed his desire for counsel to withdraw. The court explained that if it granted the motion to withdraw, the court would appoint another attorney to take over the case. The court confirmed thrice more with Prado that he wished for trial counsel to withdraw that day, and Prado answered affirmatively each time. The court sustained counsel's motion and entered an order allowing Prado's counsel to withdraw and appointing new counsel.

[14] Prado personally affirmed that he wanted the court to remove his trial counsel and appoint new counsel. A defendant in a criminal case may not take advantage of an alleged

error which the defendant invited the trial court to commit. *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001). Prado's repeated desire for his trial counsel to be removed and for subsequent counsel to be appointed is unambiguous. Therefore, we find no abuse of discretion in the court's appointment of new counsel for Prado after the verdict but before sentencing.

### 3. Motion to Suppress

Prado argues that the district court erred in denying his motion to suppress the use of any and all statements and evidence obtained by law enforcement officers during their questioning of him on March 19, 2018. Specifically, Prado claims the officers did not read him his *Miranda* rights prior to interrogation, thus invalidating all evidence and statements arising from the interview.

### (a) Standard of Review

[15] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, we review the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which we review independently of the trial court's determination. *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014).

### (b) Discussion

[16] *Miranda v. Arizona, supra*, prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. *State v. Juranek, supra*. *Miranda* requires that before interrogation, law enforcement must warn a person in custody that

he or she has the right to remain silent, that any statement the person makes may be used as evidence against him or her, and that the person has the right to an attorney, either retained or appointed. See *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012).

[17] For purposes of *Miranda*, interrogation "'refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Buckman*, 259 Neb. 924, 935, 613 N.W.2d 463, 474 (2000), quoting *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

Prado argues that Farber's question "[w]ell do you have any idea what this is about?" was intended to elicit an incriminating response. And, because this question was posed prior to Farber's reading Prado his *Miranda* rights, the entire interrogation should have been suppressed. We disagree.

In *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1984), the sheriffs entered the defendant's home with an arrest warrant. The officer asked him if he was aware why they were there to speak with him, and the defendant responded that he did not know why. The officer asked, "[I]f he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house." *Id.*, 470 U.S. at 301 (internal quotation marks omitted). The officer told the defendant that he believed he was involved in the robbery, and the defendant admitted he "was there." *Id.* (internal quotation marks omitted). His *Miranda* rights were read to him later at the sheriff's office, where he gave a full statement and signed a written confession.

The U.S. Supreme Court determined that

absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration

of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Oregon v. Elstad*, 470 U.S. at 314. Ultimately, the Court found that the unwarned statement prior to the defendant's *Miranda* warning was voluntary and thereby admissible.

In the present case, Prado responded to Farber's question by indicating that his supervisor mentioned that a customer complained that "a guy . . . went into her house and jumped into bed to her—with her," but it was not him. Although this statement was not an admission, Prado argues that it "showed inconsistencies of his statements in his later interview." Brief for appellant at 34. However, Farber's question was not designed to elicit an incriminating response. His question "[w]ell do you have any idea what this is about?" is similar to the question of whether the defendant was aware of the reason the officers were at the defendant's home in *Oregon v. Elstad, supra.* And, it is even further removed from the followup accusation in *Elstad* that led to the defendant's confession.

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial *interrogation*; at the time of Prado's statement, he was not being interrogated. An interrogation is a

practice that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . . But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 301-02, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (emphasis in original).

Nebraska has adopted an objective test, which asks: "'Would a reasonable and disinterested person conclude that police conduct, directed to a suspect or defendant in custody, would likely elicit an incriminating response from that suspect or defendant? . . .'" *State v. Bormann*, 279 Neb. 320, 327, 777 N.W.2d 829, 836 (2010), quoting *State v. Gibson*, 228 Neb. 455, 422 N.W.2d 570 (1988). We do not believe that a reasonable person would conclude that a question designed to elicit a "yes or no" response and as innocuous as "[w]ell do you have any idea what this is about?" would elicit an incriminating response. Rather, the question was a transitional one. Farber explained to Prado, "What I do is I talk to somebody and then when I'm gonna talk to 'em about the specific crime I read 'em their rights. Okay? Prior to this I've been visiting with you." Before interrogating Prado about the allegations, Farber read him his *Miranda* warning.

We find Prado's response similar to that of the defendant in *State v. Cavitte*, 28 Neb. App. 601, 945 N.W.2d 228 (2020). In *Cavitte*, the defendant was handcuffed in the back seat of a police cruiser when law enforcement questioned her about her injuries. The defendant responded that the injuries resulted from a disagreement with her husband and that they had "'been going through a lot'" in their marriage. *Id*. at 607, 945 N.W.2d at 236. The officer then read the defendant her *Miranda* warning, and she was transported to the police station where she was interrogated. The defendant was subsequently charged with second degree domestic assault. Prior to trial, she sought to have both her pre-*Miranda* and post-*Miranda* statements suppressed on the basis that they were obtained in violation of her constitutional rights. The court denied her motion.

On appeal, this court held that the defendant's response in the police cruiser was not incriminating. We further held, however, that the questions posed were not intended to elicit incriminating responses. *State v. Cavitte, supra*. Because the pre-*Miranda* statements were not made in violation of the defendant's constitutional rights, the subsequent post-*Miranda* statements were not subject to suppression.

Likewise, Prado argues that his constitutional rights were violated through interrogation prior to being read his *Miranda* warning and that therefore, his post-*Miranda* statements should also be suppressed. Having found that no constitutional violation occurred pre-*Miranda*, we reject this argument.

### 4. § 27-414 Motion

The State filed a pretrial motion under § 27-414 in which it sought to introduce evidence that Prado was previously convicted of attempted sexual assault of a child. Prado argues that the district court improperly granted the State's motion. We disagree.

### (a) Standard of Review

[18,19] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Valverde, supra*.

### (b) Background of 2014 Conviction

In a pretrial hearing, the victim from the 2014 incident, T.M., testified that the day of the incident, Prado arrived at her family's apartment looking for her mother's boyfriend. T.M.'s mother allowed him to wait in the apartment, where Prado sat on the couch and drank alcohol. Later that evening, while T.M. slept on the living room floor with a friend and Prado slept on the couch, she awoke to Prado's sliding his hand from her calf to her thigh and then squeezing her buttock. Prado then picked her up, rubbed her vaginal area over her pajamas, and rubbed her chest over her pajamas. When they heard somebody turn the shower on, Prado pushed T.M. onto the floor.

The following morning, T.M. explained to her mother what happened the previous night. When questioned, Prado stated he had picked T.M. up off the ground because the family dog had been biting her. T.M. denied this. T.M.'s mother reported the incident to the police, who arrested Prado. He pled guilty to and was convicted of one count of attempted sexual assault of a child.

### (c) District Court's Ruling

Following a hearing, the court ruled that evidence of the prior 2014 attempted sexual assault was conditionally admissible. The court determined that the 2014 crime happened, was not too remote in time, and was substantially similar to the present charge.

In its order, the court primarily focused on the similarities between the 2014 crime and the 2019 incident. The court explained that both victims were "young females," both incidents occurred in the victims' homes while the victims slept in the night, and both incidents occurred near the female's friend and involved Prado's fingers touching the victims' buttocks and vaginal areas. Differences the court analyzed included D.A.'s intoxication, how Prado's touching occurred over T.M.'s clothing but under and inside D.A.'s, and the 9-year age difference between the two victims at the time of the incidents.

Ultimately, in making its ruling, the court acknowledged that admittance of the 2014 attempted sexual assault would be prejudicial, but not "unfairly prejudicial."

### (d) Discussion

Prado's argument on appeal is that the court erred in allowing the § 27-414 evidence because the risk of prejudice substantially outweighed the probative value of the evidence. Section 27-414(3) requires that the court employ a balancing test, admitting the evidence if the risk of prejudice does not substantially outweigh the probative value of the evidence. When administering the balancing test, the court may consider any relevant factor, such as the probability that the other

offense occurred, the proximity in time and intervening cir-
cumstances of the other offenses, and the similarity of the other
acts to the crime charged. See § 27-414(3).

Prado does not deny that the 2014 incident occurred; rather,
he argues that the two cases "were vastly different." Brief for
appellant at 36. We disagree.

Although there were differences between the two inci-
dents, we find the similarities more compelling. Both incidents
involved female victims, who were sleeping near their friends.
Prado had never met either of the victims prior to the day of
the assaults and did not engage in conversation with either of
them prior to the assault. Neither the victims nor Prado spoke
during the assaults. Both assaults involved Prado's touching
the victims' buttocks and vaginal regions, although the 2014
assault was done over the victim's clothing. In both cases,
Prado left the homes when he was confronted about his behav-
ior by somebody other than the victim. The only identifiable
differences between the 2014 assault and the 2019 assault were
the victims' ages at the time of the assaults (11 years old and
20 years old, respectively), and in the current case, the victim
had consumed alcohol and did not even know that Prado was in
her apartment prior to waking up to the assault. Therefore, the
incidents had few differences and multiple similarities.

After balancing the § 27-414(3) factors, we determine that
they weigh in favor of admissibility and that the probative
value of Prado's 2014 sexual assault was not outweighed by
the danger of unfair prejudice. We therefore conclude that the
district court did not abuse its discretion in allowing evidence
of the 2014 incident.

### 5. § 27-412 MOTION

Prado assigns that the district court erred in denying his
motion to offer evidence of D.A.'s past sexual behavior under
§ 27-412. Specifically, Prado sought to question D.A. about
text messages between her and Gwen, discussing instances
when D.A. drank too much, had sex, and then regretted the

sexual encounters. We disagree that the court improperly excluded the evidence.

### (a) Standard of Review

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Valverde, supra*.

### (b) Pretrial Motion

In his pretrial motion, Prado sought to introduce evidence of D.A.'s past sexual behavior "pursuant to Neb. Rev. Stat. § 27-412, (i) and (iii)" and "the holding in *Olden v. Kentucky*, 488 U.S. 227, (1988), for the additional purpose of challenging the victim's credibility and motive to be untruthful." He claimed the existence of evidence that would prove D.A. had, in the past, consented to sex while impaired and was "remorseful or could not remember afterward."

Following a hearing, in which two exhibits consisting of text messages between D.A. and Gwen were received, the court denied the motion. In its order, the court reasoned that "[c]onsent to sex with one person while intoxicated does not imply consent with another, and while the text messages at most express some regret, the victim in no way subsequently denied the sexual contact; rather she freely discussed it with her friend."

Prado renewed his motion at trial, citing the same bases he had previously raised, which was overruled.

### (c) Discussion

Although Prado sought to introduce evidence of D.A.'s past sexual behavior under what we assume he meant to be

§ 27-412(2)(a)(i) and (iii), he argues on appeal that the evidence was admissible under § 27-412(2)(a)(ii). Because Prado never raised the applicability of this subsection in the district court, we decline to address it on appeal. See *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020) (appellate courts do not generally consider arguments and theories raised for first time on appeal).

Prado also asserts that the exclusion of this evidence violated his Sixth Amendment right to confront his accuser. He relies upon *State v. Lessley*, 257 Neb. 903, 601 N.W.2d 521 (1999). In *Lessley*, the defendant was charged with first degree sexual assault. He claimed the encounter was consensual. He sought to introduce evidence that the victim, a lesbian, had stated to a coworker that she had anal intercourse with males in the past. *Id*. Following a pretrial motion, the court held that the evidence was inadmissible under Nebraska's rape shield statute. See § 27-412.

During trial, the State elicited evidence from the victim that she was a lesbian. *State v. Lessley, supra.* Thereafter, the defendant renewed his motion to present evidence of the victim's past sexual conduct multiple times, arguing that her testimony that she was a lesbian showed a greater likelihood the encounter was not consensual and that he had a constitutional right to confront his accuser. The court denied his motions. *Id*.

[20] On appeal, the Supreme Court agreed that the evidence of the victim's past sexual behavior was not admissible under the rape shield statute, but held that the exclusion of the evidence violated the defendant's Sixth Amendment right to confront his accuser. See *State v. Lessley, supra.* In reaching this decision, the *Lessley* court agreed with the defendant that the State had "opened the door" to the victim's homosexuality during its direct examination of her. It explained that the principle of "'[o]pening the door' is simply a contention that competent evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue. *State v. Harrold*, [256 Neb. 829, 855, 593

N.W.2d 299, 319 (1999)], quoting *Clark v. State*, [332 Md. 77, 629 A.2d 1239 (1993)]." *State v. Lessley*, 257 Neb. at 908, 601 N.W.2d at 526.

In the present case, Prado renewed his motion to admit § 27-412 evidence, stating that

> the prior sexual history, to prove habit and to prove, you know, that she was going out and getting drunk and hav[ing] sex and planned for sex, and regretted it the next day, things like that, and I can't think of the other purposes, but just our motion that we had filed for those purposes, and I just need to renew that for the record.

Prado did not argue that the State opened the door to such testimony through its direct examination of D.A. As such, we find no error in the district court's refusal to allow Prado to offer evidence of D.A.'s prior sexual behavior under § 27-412. See *State v. Devers, supra*.

Regardless of Prado's failure to argue to the district court that the State opened the door to D.A.'s prior sexual conduct, we disagree that the State did so. The State asked no questions regarding any part of D.A.'s sexual history. Unlike the victim in *State v. Lessley, supra*, D.A. did not deny on direct examination that she had previously engaged in the type of behavior at issue; rather, the issue was not raised. Therefore, the State did not open the door to her sexual history.

### 6. Sufficiency of Evidence

Prado assigns that the evidence presented at trial was insufficient to convict him of first degree sexual assault. Viewing the record in the light most favorable to the State, we disagree.

### (a) Standard of Review

[21] In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is

sufficient to support the conviction. *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005).

(b) Discussion

Prado was convicted of one count of aggravated first degree sexual assault. The first degree sexual assault statute, § 28-319, sets forth the elements of the offense. Section 28-319(1) provides, in relevant part, that one is guilty of first degree sexual assault if one "subjects another person to sexual penetration (a) without the consent of the victim [or] (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct." Prado contends that the State failed to prove beyond a reasonable doubt that D.A. did not consent or that Prado should have known she was incapable of consent.

Neb. Rev. Stat. § 28-318(8) (Reissue 2016) defines the phrase "without consent" to mean, in relevant part:

> (a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor[.]

Prado argues that D.A. was awake when the digital penetration was occurring but that she did not object until "she felt a penis on her back." Brief for appellant at 41. He further asserts that D.A. testified she thought it was Brenden who was on the bed and allowed the interaction to continue. Therefore, he contends that the State failed to prove the interaction was without D.A.'s consent. We disagree.

We first take into account the circumstances in which this incident occurred. Prado entered the apartment of a woman whom he had never met and let himself into her bedroom where he lay down between her and her friend in the hopes of having a "threesome." He then proceeded to digitally penetrate

her while she slept. From this, a jury could reasonably conclude that Prado's actions were without D.A.'s consent. See *State v. Koperski*, 254 Neb. 624, 578 N.W.2d 837 (1998) (requiring conclusion regarding victim's consent be objectively reasonable).

Prado argues that D.A. did not immediately resist; therefore, the interaction was consensual. However, even if her inaction could be considered consent, § 28-318(8)(a)(iv) categorizes such a situation as nonconsensual. This subsection states that consent that "was the result of the actor's deception as to the identity of the actor" qualifies as being without consent. § 28-318(8)(a)(iv). As explained in the legislative history of 1995 Neb. Laws, L.B. 371, § 3, this deception language was included to encompass situations in which an intruder, who the victim believed was someone else, penetrates the victim. As clarified by the amendment's introducing senator, this would be a situation "in which it would . . . not be necessary to establish a physical resistance to the rapist and still preserve the possibility of a conviction for rape." Floor Debate, L.B. 371, 94th Leg., 1st Sess. 8366 (May 24, 1995) (remarks of Senator David Landis).

D.A. explained that she was "half asleep, half awake" and initially thought the person on her bed was Brenden. Without determining who the person was, D.A. left the bed to end the encounter. Therefore, even if D.A.'s initial inaction could be considered consent, it does not exculpate Prado's actions. Reviewing the evidence in a light most favorable to the State, we find the evidence sufficient for a jury to determine that Prado penetrated D.A. without her consent. In light of this conclusion, we need not address whether the victim lacked the mental capacity to consent under § 28-319(1)(b). See *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018).

### 7. EXCESSIVE SENTENCE

Prado assigns that the district court erred by imposing an excessive sentence. We find no abuse of discretion in the sentence imposed.

### (a) Standard of Review

[22] When a trial court's sentence is within the statutory guidelines, the sentence will be disturbed by an appellate court only when an abuse of discretion is shown. *State v. Spang*, 302 Neb. 285, 923 N.W.2d 59 (2019).

### (b) Discussion

Aggravated first degree sexual assault is a Class II felony, punishable by 1 to 50 years' imprisonment. See, § 28-319; § 28-105. Prado was sentenced to 24 to 26 years' imprisonment and lifetime community supervision, and he was required to register under Nebraska's Sex Offender Registration Act. See, § 83-174.03; § 29-4001. Because his sentence is within the prescribed statutory limitations, we review for an abuse of discretion.

[23] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Spang, supra*. When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

The "Level of Service/Case Management Inventory" (LS/CMI) indicated Prado's education/employment, family/marital status, companions, and procriminal attitude/orientation put him at a very high risk of recidivism. Prado was 27 years old at the time of sentencing. He dropped out of high school in the 11th grade. He reported one expulsion for burglary and criminal mischief, although he claims to have had good

relationships with his teachers and classmates. Prado held multiple jobs between 2017 and the time of sentencing, remaining in each position between 2 months and 1 year. He was unemployed without health insurance at the time of sentencing.

Prado has not spoken to his father, who has a criminal history, since 2018, but he speaks to his mother every week. He has an adult sister and an infant brother, but he does not contact his sister often. Prado has no current romantic partner and claims to have been the subject of sexual abuse by various women in the past. He reports having only one friend who he does not see often.

Regarding the current case, Prado denied any wrongdoing. He indicated a desire for probation, although his past attempts at probation ended in revocation due to law violations, probation violations, and absconding. The LS/CMI noted that Prado's "ongoing involvement in criminal activities despite the consequences reflects a general disregard for the laws and an attitude that is supportive of crime."

The LS/CMI indicated that Prado's criminal history and antisocial pattern put him at a high risk of recidivism. Prado has a lengthy criminal history, both as a juvenile and as an adult. His adult history includes multiple traffic infractions, along with two counts of driving under the influence, escape, possessing or consuming open alcohol containers, a third degree sexual assault of a child charge that was amended to attempt, four counts of violating his sex offender registration, possession of "K2" or marijuana, failure to appear in court, furnishing false or misleading information, and false reporting. The LS/CMI noted that Prado "appears to have a tolerance for deviancy and a tendency to resort to criminal alternatives." He claims that authority figures tend to demean and disrespect him.

Prado's history with alcohol and drugs puts him at a low risk of recidivism according to the LS/CMI. The LS/CMI indicated multiple skill deficits for Prado, including impulse control, making appropriate decisions, using good judgment, problems with authority, his history of assault, and setting boundaries,

among others. Additionally, Prado underwent a sex offender risk assessment, which is used to indicate the appropriateness of community supervision. Prado ranked in the moderate-high risk category. Ultimately, the LS/CMI stated Prado appeared to be in the "pre-contemplative stage of change."

At sentencing, the district court made clear that it read and considered the contents of the presentence investigation report. Thus, when considering all of the information contained in the presentence investigation report and the required sentencing factors under *State v. Spang*, 302 Neb. 285, 923 N.W.2d 59 (2019), the court did not abuse its discretion in its sentencing of Prado.

## V. CONCLUSION

For the aforementioned reasons, we affirm Prado's conviction and sentence.

Affirmed.